Present: All the Justices

MICHAEL WAYNE HASH
                                              OPINION BY
v.  Record No. 081837      JUSTICE LEROY F. MILLETTE, JR.
                                            November 5, 2009
DIRECTOR OF THE
DEPARTMENT OF CORRECTIONS

            FROM THE CIRCUIT COURT OF CULPEPER COUNTY
                      John R. Cullen, Judge

    In this appeal, we consider whether the Circuit Court of

Culpeper County erred in denying a writ of habeas corpus to

Michael Wayne Hash.

                I. Facts and Proceedings Below

                   A.   Procedural History

    In February 2001, Hash was found guilty in a jury trial

of the capital murder of Thelma B. Scroggins ("Scroggins" or

"the victim").  He was sentenced to life imprisonment without

the possibility of parole.  At the time of Scroggins' murder

in July 1996, she was seventy-four years old.  Hash was

fifteen years old.  Hash was not charged with the murder until

2000 when he was nineteen years old.

    Hash appealed his conviction to the Court of Appeals,

which affirmed the trial court's judgment in an unpublished

opinion.  Hash v. Commonwealth, Record No. 1290-01-4 (Sept. 3,

2002).  We denied his petition for appeal and petition for

rehearing in this Court.

Hash filed a petition for habeas corpus in the Circuit Court of Culpeper County on April 19, 2004, in which he raised claims of ineffective assistance of counsel and prosecutorial misconduct. The circuit court[1] held that Hash's attorneys' performance was deficient, but Hash failed to prove prejudice as required under Strickland v. Washington, 466 U.S. 668 (1984). The circuit court further held that there was insufficient proof of prosecutorial misconduct. Hash appeals the judgment of the circuit court. Gene M. Johnson, Director of the Department of Corrections ("Director" or "Commonwealth") did not appeal the holding that Hash's attorneys' performance was deficient.

### B. Hash's Criminal Trial

Evidence presented at trial revealed that Scroggins was found dead in her home, having suffered four gunshot wounds to the head at close range. Three of the wounds were to the left side of her head and one was to the back of her head. Investigator Scott H. Jenkins from the Culpeper County Sheriff's Office testified that the only DNA recovered from the scene was from the victim and that while five fingerprints were recovered from the storm door, no match was ever made. Furthermore, no firearm was recovered that matched the bullets

_____

[1] References to the underlying criminal trial will utilize the phrase "trial court." References to the habeas corpus proceedings will utilize the phrase "circuit court."

recovered from the victim's body.  The bullets were identified as .22 caliber.

The evidence against Hash at trial included testimony from "an eyewitness," Eric Weakley ("Weakley"), testimony from Hash's cousin, Alesia Shelton ("Shelton"), Hash's statements to the police and his own testimony in which he admitted that he, Weakley, and Jason Kloby ("Kloby") discussed robbing an "old lady" in the area, and testimony from Paul Carter ("Carter") that Hash confessed to him while they were in jail together.  There was no physical evidence that connected Hash to the murder.

Shelton testified that on the night Scroggins was murdered she overheard Hash and Kloby at Hash's house talking about Scroggins and how "they were going to do it tonight" and that Hash said "they should make her suffer."  Shelton also testified that after she left Hash's house that night, she saw "the blue car from [Hash's] house" parked near the victim's house.

Shelton also stated that on a later occasion she, Kloby, and Hash rode their bicycles to a church across from Scroggins' house, where Kloby told her how he and Hash had gained entry to Scroggins' house and shot her.  Shelton testified that she looked at Hash and he "nodded his head and said yes--yeah."  Shelton testified that Hash "said to

3

[Kloby], he said you couldn't do nothing like that, could you, man, and [Kloby] was like no, man, not me, you know I couldn't do nothing like that, and then laughed" in a sarcastic manner.

Weakley testified that he, Kloby, and Hash gained entry into Scroggins' house and attacked her. Weakley stated that Hash shot the victim first, "[t]wice in the side of the head . . . [t]he left side." Weakley also stated that Kloby shot her again "around the same place," then fired the last shot into the back of her head.

Carter testified that while he and Hash were being held in the Charlottesville-Albemarle Regional Jail, they spoke with each other. Carter said that Hash revealed that he was charged with murder. Carter stated that he told Hash that his cousin was in jail on a "murder case, same thing, capital murder." Carter testified that Hash then asked him if he could "get convicted without a gun." Carter testified that in the course of this dialogue Hash confessed to the murder, saying he "shot the lady twice" and that he used a .22 caliber gun and that he "got away in a vehicle, her truck or whatever she had, the vehicle, that's all. He said vehicle." Carter said that Hash confessed "it was him and two other dudes while he was doing it." Carter also testified that Hash told him "he had a cousin that was trying to tell on him what happened about the whole case and everything."

Hash testified at his trial on his own behalf that in the beginning to middle part of 1995 he talked with Kloby and Weakley about robbing somebody in the area. Hash said that Kloby and Weakley wanted to rob somebody who was not going to put up much of a fight, and Hash assumed they were talking about an old lady. Hash believed that the proposed robbery was to get money for drugs because "[o]ver the course of time there was a time when Jason [Kloby], Eric [Weakley] and myself did do drugs." Hash assumed "they were planning this months in advance to get some money for drugs." According to Hash, Kloby mentioned the robbery a second time in a telephone conversation two to four weeks after the first conversation, and a final time "several months down the road to a year later in the mall." At his trial, Hash testified that he told Kloby he did not "want to have anything to do with it," but admitted originally planning on participating. According to Hash, "[i]t's not something [he] really wanted to be involved in, but [he] was saying [he] was going to be involved in." Hash denied to the jury any participation in the murder.

## C. The Habeas Corpus Proceeding

In his habeas corpus proceeding, Hash alleged that his attorneys were deficient in failing to discover letters that Carter wrote to a federal district court judge and others seeking assistance in obtaining a reduction of his sentence in

5

a federal case because of his testimony in Hash's trial. Hash further alleged that his attorneys' deficiencies prejudiced his case and, had these communications been revealed to the jury, it would have undermined Carter's credibility and created a reasonable doubt concerning Hash's guilt.

A hearing on Hash's habeas corpus petition was held on October 16 and 17, 2007. According to Carter, Hash confessed to him in "April, May, around that area" of 2000. Evidence revealed that on May 24, 2000 Hash was transferred to the jail where Carter was held. Carter first contacted Investigators Jenkins and Mack on June 26, 2000.

Investigator Mack testified that Carter was a "substantial witness" and agreed that once Carter became a witness it "change[d] the way he looked at the case." Investigator Mack characterized the case as "iffy" with just Shelton and Weakley as witnesses. When asked to evaluate the value of Carter's testimony, he replied, on a "[s]cale of one to ten, I would say eight."

Richard Davis ("Davis"), one of Hash's attorneys for Hash's murder trial, testified that the Commonwealth's Attorney told him about Carter before trial, that Davis had written a note in Hash's case file that Carter was involved with a federal drug case, and that he was aware that Carter had "testified before the feds." Davis stated that "[l]ooking

6

at [Carter's] file you could learn some things perhaps" and admitted that having Carter's letters would have been "very helpful."

Michael T. Hemenway ("Hemenway"), Hash's other attorney at trial, testified that he had information about Carter before trial, including the fact that Carter "was a big drug dealer and that he had cooperated before and that he had reduced his sentence based on that cooperation." As between the two attorneys, Hemenway was responsible for the investigation of Carter. Hemenway admitted he did not obtain or review Carter's file in the federal district court before Hash's trial for capital murder. Hemenway acknowledged that looking into Carter's federal file would have been a "good idea" and stated that Carter's letters were "potentially useful." However, Hemenway did not believe that in cross-examining Carter he needed to use even the documents he did possess, which included Carter's federal indictment and conviction order, because Carter freely admitted his conviction. In addition, Hemenway testified that Carter talked freely about his motion under § 5K1.1 of the U.S. Sentencing Guidelines Manual (2000) for favorable sentencing consideration in light of his substantial assistance and Rule

35(b)[2] motion for reduction of sentence and "certainly didn't deny it that he had reduced his sentence."

Both parties stipulated to Hash's exhibits in the habeas proceeding, which included copies of the letters that Carter had written to the federal district court judge and others concerning a sentence reduction. In total, Carter wrote 25 letters to the federal district court judge and others, all concerning his request for assistance in obtaining a "35(b) motion" in federal court to have his federal sentence reduced in recognition of his testimony in Hash's trial. Of those

---

[2] At the time of Hash's trial, Rule 35(b), entitled "Reduction of sentence for substantial assistance," provided:

> If the Government so moves within one year after the sentence is imposed, the court may reduce a sentence to reflect a defendant's subsequent substantial assistance in investigating or prosecuting another person, in accordance with the guidelines and policy statements issued by the Sentencing Commission under 28 U.S.C. § 994. The court may consider a government motion to reduce a sentence made one year or more after the sentence is imposed if the defendant's substantial assistance involves information or evidence not known by the defendant until one year or more after sentence is imposed. In evaluating whether substantial assistance has been rendered, the court may consider the defendant's pre-sentence assistance. In applying this subdivision, the court may reduce the sentence to a level below that established by statute as a minimum sentence.

Fed. R. Crim. P. 35(b) (superseded by amendment 2002).

letters, five were written before Carter testified at Hash's February 2001 capital murder trial.

The circuit court held that Hash's attorneys were deficient in failing to examine Carter's federal file but that their deficiency did not prejudice Hash's defense. Additionally, the circuit court held that there was no prosecutorial misconduct in Hash's trial. The circuit court dismissed Hash's petition for a writ of habeas corpus. Hash timely appealed the circuit court's judgment, and we awarded Hash an appeal limited to two assignments of error:

1. The circuit court erred in denying habeas relief on Claim A regarding "snitch" testimony from Paul Carter and ruling that, although counsel's performance was constitutionally deficient, there was no reasonable probability of a different result.

2. The court erred in failing to grant habeas relief specifically on Claim A(4), when the prosecution used the perjured testimony of Paul Carter.

The Commonwealth did not appeal the circuit court's holding that the performance of Hash's attorneys at trial was deficient under Strickland.

## II. Analysis

### A. Standard of Review

We have held that

"[o]ne attacking a judgment of conviction in a habeas corpus proceeding has the burden of proving by a preponderance of evidence the allegations contained in [the] petition." Nolan v. Peyton, 208 Va. 109, 112, 155 S.E.2d

9

> 318, 321 (1967). Because entitlement to habeas
> relief is a mixed question of law and fact, the
> circuit court's findings and conclusions are
> not binding upon this Court, but are subject to
> review to determine whether the circuit court
> correctly applied the law to the facts.
> Williams v. Warden of Mecklenburg Correctional
> Ctr., 254 Va. 16, 24, 487 S.E.2d 194, 198
> (1997).

Curo v. Becker, 254 Va. 486, 489, 493 S.E.2d 368, 369 (1997).

### B.    Ineffective Assistance of Counsel

The United States Supreme Court in Strickland established a two-prong test to determine whether an attorney was ineffective such that a new trial is warranted. 466 U.S. at 687. In the first prong, "the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id. In the second prong, "the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Id. The Supreme Court held that "[u]nless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable." Id.

Here, the Commonwealth did not assign error to the circuit court's finding that Hash's defense attorneys were

10

deficient in not fully examining Carter's federal case file. Therefore, the only issue on appeal before us is the second prong of the Strickland analysis – whether Hash's attorneys' deficiencies prejudiced his defense.

"The question whether a prisoner is entitled to habeas relief is a mixed question of law and fact.  Consequently, a circuit court's conclusions of law are not binding on this Court but are subject to review to ascertain whether the circuit court correctly applied the law to the facts."  Green v. Young, 264 Va. 604, 608-09, 571 S.E.2d 135, 138 (2002) (citations omitted).  In analyzing the "prejudice prong" of an ineffective assistance of counsel claim, we must consider the totality of the evidence.  Id. at 113, 645 S.E.2d at 504.  However, "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment."  Strickland, 466 U.S. at 691.  In seeking to prove that the judgment was affected by an error of the defendant's counsel,

> [t]he defendant must show that there is a
> reasonable probability that, but for counsel's
> unprofessional errors, the result of the
> proceeding would have been different.  A
> reasonable probability is a probability
> sufficient to undermine confidence in the
> outcome. . . . [T]he question is whether there
> is a reasonable probability that, absent the

>       errors, the factfinder would have had a
>       reasonable doubt respecting guilt.

Id. at 694-95.

Hash argues that because his attorneys were deficient in not discovering and using the letters Carter wrote to the federal district court judge sentencing Carter, his attorneys could not properly impeach Carter and could not counter Carter's portrayal by the Commonwealth as a trustworthy witness. According to Hash, other than Carter's testimony, the evidence against him at trial primarily consisted of the testimony of Weakley and Shelton, both of whom admitted lying to police officers and whose testimony was not consistent with their previous statements or with each other's testimony. Hash emphasizes Investigator Jenkins' testimony that he interviewed Shelton and Weakley "repeatedly," that Shelton told him "two different stories," and that Weakley "repeatedly lied and gave different versions of the truth." Finally, Hash argues that because co-defendant Kloby was found not guilty in a separate trial despite the testimony of Weakley and Shelton, Carter's testimony must have been the crucial distinction between the two trials and that the projected effect of available additional impeachment of Carter's motivation to testify raises a reasonable probability of a different result.

The Commonwealth counters that Carter's credibility was established by his knowledge of critical facts about the murder that had not been in the public domain, namely the caliber of the weapon that had been used and the fact that Hash's cousin, Shelton, was cooperating with investigators. Accordingly, the Commonwealth argues that because only the killers could have known such details, Carter's testimony was credible and cross-examination about his motive to testify would not have influenced the outcome of the case.

In response to this contention, Hash argues that Carter could have "used the entire month (from the time he met [Hash] to the time he contacted law enforcement) to collect information from any number of sources, or that Paul Carter was intentionally or inadvertently provided information about the case by law enforcement." Hash contends the fact that he, Shelton, Kloby, and Weakley had been incarcerated in various places during the same period is consistent with this argument.

We hold that because Carter's credibility was sufficiently impeached by Hash's attorneys regarding his motivation for testifying and because the letters did not provide additional impeachment information, Hash has not shown that there is a reasonable probability of a different result had Hash's attorneys impeached Carter with his letters.

13

According to Carter's testimony at trial, Hash told Carter about his involvement in the Scroggins murder a few months before Carter's July 3, 2000 sentencing in federal district court before Senior United States District Judge James H. Michael, Jr. Seeking to get a reduced sentence, Carter contacted Culpeper County investigators and gave them an oral and a written statement concerning what Hash had told him. After speaking with the investigators, Carter asked them to speak on his behalf to federal prosecutors prior to Carter's sentencing about his assistance in the Scroggins case. The investigators advised Carter that nothing could be done in exchange for his testimony. Carter said that he understood; however, at Carter's request, the investigators agreed to advise the Culpeper County Commonwealth's Attorney about Carter's assistance.

After his sentencing but before Hash's trial, Carter wrote five letters to Judge Michael. In the letters, Carter expressed his concern regarding his inability to contact his lawyers about his Rule 35(b) motion. While Carter made references in the letters regarding assisting state authorities by providing information in the Scroggins case, Carter's primary purpose in writing the letters was to urge Judge Michael to contact Carter's lawyers or to appoint Carter a new lawyer to aid with his potential Rule 35(b) motion. In

14

responding to Carter's letters, on August 28, 2000 Judge Michael entered an order, which he provided to Carter, denying Carter's pro se motion for reduction of sentence pursuant to Federal Rule of Criminal Procedure 35(b).  The order also stated, "[T]he defendant may also wish to discuss the matter with the prosecuting Assistant United States Attorney; however, the United States not having made such a motion, the court is without authority at this time to correct or reduce the defendant's sentence pursuant to Rule 35(b)."

Hash's argument that without using Carter's five letters to Judge Michael, his attorneys could not effectively impeach Carter, is belied by the trial record demonstrating the impeachment of Carter's credibility.  The following exchange took place during cross-examination of Carter:

> [Defense counsel:]  You called the investigators, and after you gave them information, did you ask them that if it was possible, for them to speak on your behalf to the U.S. Attorney?
>
> [Carter:]           Yeah, I did.
>
>                  . . . .
>
> [Defense Counsel:]  And you specifically asked them to speak on your behalf to the U.S. prosecutor . . . [o]n July 3rd of 2000?

15

[Carter:]                Yes.

                    . . . .

[Defense counsel:]    And isn't it true that
                      during those two years
                      what you've been doing
                      is testifying against
                      other people in an
                      attempt to get what's
                      a 5K motion, a motion
                      for substantial
                      assistance?

[Carter:]             Right, testify against
                      one dude.

                    . . . .

[Defense counsel:]    Okay.  Now under the
                      federal rules, you
                      know what a Rule 35B
                      is, don't you?

[Carter:]             Yes, I do.

[Defense counsel:]    And why don't you tell
                      the jury what that is?

[Carter:]             It's when you come
                      back within a year to
                      get your time cut.

[Defense counsel:]    Okay.  So you can
                      further reduce your
                      sentence if you
                      testify within twelve
                      (12) months of July
                      3rd of 2000, is that
                      right?

[Carter:]             I don't know if the
                      state applies to the
                      fed.

16

```
[Defense counsel:]   Well, when you called
                     the – when you talked
                     to the investigators,
                     that's what your –
                     that's what you called
                     them about, right?

[Carter:]            When I called the
                     investigators?

[Defense counsel:]   When you called Mr.
                     Close and when you
                     talked to the
                     investigators, wasn't
                     that for the purpose
                     of reducing your
                     sentence potentially?

[Carter:]            Somewhat, yes, but if
                     somebody--that could
                     have been my
                     grandmother, your
                     grandmother or
                     somebody else.  I
                     would feel somebody
                     else would do the same
                     thing for me.

          . . . .

[Defense Counsel:]   And the Rule 35B began
                     running for twelve
                     (12) months, began
                     running on July 3rd of
                     2000, is that right?

[Carter:]            Yes.

          . . . .

[Defense counsel:]   Your understanding of
                     the substantial
                     assistance motion as
                     well as the 35B is
                     that you just help the
                     prosecutor in a case
                     and you will get
```

17

|                       |                                                                                          |
|-----------------------|------------------------------------------------------------------------------------------|
|                       | credit for it, is that right?                                                            |
| [Carter:]             | Say that again, please, repeat it.                                                       |
| [Defense counsel:]    | Either the motion for substantial assistance or the Rule 35B is just helping the prosecutor with the case? |
| [Carter:]             | Yeah, that's a federal case.  It don't say nothing about state case.                     |
| [Defense counsel:]    | That's your understanding of it, is that what you're saying?                             |
| [Carter:]             | No, that's my – yeah, that's my understanding.                                           |
| [Defense counsel:]    | And you could be wrong about that?                                                       |
| [Carter:]             | Yeah.                                                                                    |

As a result of Carter's responses, his credibility as a witness was impeached by demonstrating that his motivation to testify was, in part, to seek a sentence reduction in his federal case.  Moreover, counsel for Hash, in opening and closing statements, discussed Rule 35(b) motions in the federal system and Carter's motivation to testify in Hash's trial, and provided the jury both the context for Carter's

18

impeachment and subsequent argument attacking Carter's

credibility as a witness.  During opening statements, counsel

for Hash told the jury:

> [I]n the federal system he [Carter] is able to
> reduce his sentence by testifying for the
> government in some capacity as long as it's
> testifying against somebody else, helping them
> bring a new case. . . .  [I]f he can't testify
> in court against somebody, he doesn't get his
> motion for substantial assistance. . . .  And
> also you'll hear evidence in the federal system
> he has another twelve months under what's
> called a Rule 35B to produce more evidence, and
> as long as he keeps testifying against other
> people, he gets to further reduce his
> sentence. . . .  Maybe he'll convince you he's
> telling the truth.  But he has an incredible,
> incredible motive to tell you that Michael Hash
> said something to him . . .

Additionally, in closing argument, counsel for Hash urged

the jury to consider Carter's motivation for testifying:

> [H]e also still has his Rule 35 and he knows
> about it.  He's not a stupid guy. . . .  He
> knows the system, he knows how it's done.  And
> ask yourself this question.  Can I trust this
> guy not to lie?  Can I trust him, would I make
> a decision, would I make any decision based on
> his word, particularly where his self-interest
> is an issue.

Considering Carter's testimony, especially in light of

Hash's counsel's opening and closing statements regarding

Carter's motivation to testify and the availability to Carter

of the Rule 35(b) motion, information in the letters would not

have provided any additional impeachment evidence for the

defense.  Although Carter was equivocal on the issue of

19

whether providing assistance to the Culpeper County Commonwealth's Attorney would qualify as the kind of assistance required for a Rule 35(b) motion, there is nothing in the letters that would have further impeached him on that specific point. The letters were only additional indications of Carter's interest in pursuing a Rule 35(b) motion.

The real issue, however, was not whether assisting in a state prosecution would qualify for a Rule 35(b) reduction in sentence, but rather whether Carter thought that assisting in Hash's prosecution might help him gain such a reduction. Despite Carter's protestation that he did not know whether helping a state prosecution would qualify for Rule 35(b) treatment, it was clear from his responses to Hash's attorneys' cross-examination that he had sought to assist himself in reducing his sentence. The letters did not further impeach Carter because even though the letters repeated his interest in obtaining a Rule 35(b) reduction, the letters also clearly acknowledged Carter's understanding that he had to ask the United States Attorney to bring the Rule 35(b) motion. Nothing in the letters clarified whether Carter knew he could rely on assisting a state prosecution as a basis for a Rule 35(b) motion or whether the assistance had to be in connection with a federal prosecution. Therefore, the letters did not provide additional impeachment to what Hash's attorneys had

20

accomplished through eliciting testimony from Carter about the relationship between his testimony against Hash and a reduction of Carter's sentence.

The evidence presented at trial was such that any potential further impeachment of Carter by use of his letters would not have yielded a reasonable probability of a different result at trial. "[A] court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury." Strickland, at 695. See also Lester v. Ayers, 267 Fed. Appx. 725, 727 (9th Cir. 2008) (given the degree of successful impeachment, additional impeachment urged by defendant would not have changed the result of the proceedings); Aldridge v. Dugger, 925 F.2d 1320, 1326 (11th Cir. 1991) (because defendant had already been severely impeached, any additional impeachment would have been merely cumulative and would not have changed the result of the trial).

In Hash's argument that the possibility of additional impeachment of Carter about his motive to testify establishes a reasonable probability of a different result, Hash attempts to minimize the significance of his own statements to the police and trial testimony. Hash admitted that he spoke with Weakley and Kloby about robbing someone in the area who would not put up much of a fight. Hash testified that he assumed

21

they were talking about an old lady.  Hash also testified that he spoke with Kloby on two other occasions about robbing someone in the area.  Furthermore, Hash admitted that he planned on participating in the robbery, but claimed he only later changed his mind after having "second thoughts about it."  At the habeas hearing Hash's attorneys testified that they considered Hash's pretrial statements to the police and his trial testimony to be the biggest distinction between Hash's conviction and co-defendant Kloby's acquittal.  According to Davis, "the biggest piece that we thought that was different from our case and Kloby's case was not Mr. Carter but Mr. Hash's statement."  Davis emphasized that since Kloby had not made a statement to the police, "that's one of the reasons why he [Kloby] didn't testify."  Additionally, Davis testified that Kloby's alibi held up better than Hash's.

Thus, the jury had the opportunity to observe Hash and to weigh his credibility on this critical issue.  The trial judge, who presided over Hash's trial and also conducted an exhaustive habeas proceeding over two days which resulted in a detailed 22 page opinion letter and an equally detailed 19 page order, also distinguished Hash's conviction from Kloby's acquittal in part because of Hash's statement to the investigators and his trial testimony.

Considering the totality of the evidence, we conclude that Hash has not met the burden of showing a reasonable probability that, but for counsels' error in failing to investigate the federal file and use the letters to further impeach Carter, the trial would have had a different result. Hash has not established that his attorneys' failure to use the potential limited impeachment benefit from his attorneys' use of Carter's letters to the federal district court judge – when Carter's motivation in testifying had already been clearly demonstrated – constituted a breakdown in the adversary process that renders Hash's conviction unreliable. See Strickland, 466 U.S. at 687.

### C.   Prosecutorial Misconduct

Hash argues that there is no doubt that Carter's testimony regarding his motivation to testify and whether his assistance in Hash's trial would aid his Rule 35(b) motion was perjured, and the Commonwealth knew or should have known that Carter was committing perjury.  Hash also contends the Commonwealth failed to correct Carter's erroneous and perjured testimony.

The Commonwealth responds that it did not have knowledge whether Carter's testimony was untrue.  The Commonwealth also notes that at the evidentiary hearing in the circuit court, Hash presented no evidence of the Commonwealth's knowledge of

Hash's letters to Judge Michael or the mechanics of federal Rule 35(b) proceedings. Moreover, the Commonwealth contends that at the beginning of Hash's trial the Commonwealth's Attorney told Hash's counsel that Carter had previously assisted the federal government. The Commonwealth argues there was no attempt to hide Carter's motivation in reducing his federal sentence, but merely to emphasize that Carter had not been promised anything by the Commonwealth in exchange for his testimony against Hash.

The United States Supreme Court has held that a conviction must be reversed if the state knowingly used false testimony in securing a conviction where the "false testimony . . . may have had an effect on the outcome of the trial." Napue v. Illinois, 360 U.S. 264, 272 (1959). The Supreme Court also noted that this rule applies even where the perjured testimony only relates to a witness' credibility:

> The principle that a State may not knowingly
> use false evidence, including false testimony,
> to obtain a tainted conviction, implicit in any
> concept of ordered liberty, does not cease to
> apply merely because the false testimony goes
> only to the credibility of the witness. The
> jury's estimate of the truthfulness and
> reliability of a given witness may well be
> determinative of guilt or innocence, and it is
> upon such subtle factors as the possible
> interest of the witness in testifying falsely
> that a defendant's life or liberty may depend.

Id. at 269.

24

"In order to find that a violation of Napue [v. Illinois] occurred in this case, we must determine first that the testimony [at issue] was false, second that the prosecution knew of the falsity, and finally that the falsity affected the jury's judgment." Teleguz v. Commonwealth, 273 Va. 458, 492, 643 S.E.2d 708, 729 (2007). Hash claims that Carter committed perjury in testifying regarding his motivation to testify and regarding whether his assistance in Hash's trial would aid in his Rule 35(b) motion. Hash's argument that Carter committed perjury concerning his motivation for testifying is not supported by the record. Carter clearly admitted testifying in a federal case to get his sentence reduced and acknowledged his desire to have the Commonwealth talk to the United States Attorney on his behalf. Despite his comment about testifying because of the victim, there is no doubt that at least part of his motivation was to exchange his testimony for consideration as to the reduction of his sentence, a clarification that was explicitly brought to the jury's attention by Hash's attorneys.

Whether Carter or the Commonwealth knew that Carter's testimony in a state court proceeding could qualify as assistance for a Rule 35(b) motion is not clear. Although the record does reveal that Carter's testimony at Hash's trial resulted in a reduction in his federal sentence following the

United States Attorney's Rule 35(b) motion, there is no evidence that anyone knew at the time that Carter testified that his assistance in the state prosecution would qualify for federal relief. Furthermore, there is no evidence whatsoever of a pre-arranged agreement with the federal prosecutor to make a Rule 35(b) motion. In fact, the only evidence is that no promises were made to Carter in exchange for his testimony. In his closing argument, the Commonwealth's Attorney, instead of improperly vouching that Carter's assistance could not be the basis of a Rule 35(b) motion for sentence reduction, clarified that there simply was no agreement with Carter in exchange for his testimony.

Since Hash has failed to establish that Carter's testimony was false, there can be no way to establish that the prosecution knew of any alleged falsity. Consequently, we need not consider any impact that Carter's testimony about his motivation and the benefit of his assistance might have had upon the jury's judgment. Therefore, we hold that the circuit court did not err in denying Hash habeas relief on his Claim A(4), asserting entitlement to relief based upon prosecutorial misconduct.

### III. Conclusion

For these reasons, we find the circuit court did not err in denying Hash a writ of habeas corpus. We affirm the judgment of the circuit court.

Affirmed.