UNPUBLISHED

COURT OF APPEALS OF VIRGINIA

Present: Judges Humphreys, Huff and Malveaux
Argued by teleconference

JONATHAN JULIAN VEJARANO

v.     Record No. 0526-19-2

COMMONWEALTH OF VIRGINIA

MEMORANDUM OPINION* BY
JUDGE GLEN A. HUFF
MAY 12, 2020

FROM THE CIRCUIT COURT OF SPOTSYLVANIA COUNTY
Ricardo Rigual, Judge

Carol J. Pruski (Colette T. Connor; Williams & Connolly LLP, on
briefs), for appellant.

Robert H. Anderson, III, Senior Assistant Attorney General
(Mark R. Herring, Attorney General, on brief), for appellee.

Following a jury trial, Jonathan Julian Vejarano ("appellant") was convicted of

first-degree murder, use of a firearm during the commission of a felony, and conspiracy to

commit first-degree murder. In accordance with the jury verdict, the trial court sentenced

appellant to a life sentence for the murder charge plus five years' incarceration for the conspiracy

charge and three years' incarceration for the firearm charge.

Appellant moved to set aside the verdicts, arguing that the Commonwealth failed to

disclose material impeachment evidence related to one of the Commonwealth's witnesses. At

trial, that witness had testified that he was not promised anything in exchange for his testimony.

However, appellant claimed he discovered after trial that the witness was offered "favorable

treatment" regarding a criminal sentence. Appellant also requested to subpoena the

Commonwealth's attorneys whom he averred made the offer. The trial court denied appellant's

---

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

requested subpoenas, found that all requisite disclosures had been made, and denied appellant's motion to set aside.

On appeal, appellant argues that his due process rights were violated because the witness lied and the Commonwealth failed to disclose material impeachment evidence. Therefore, appellant contends that the trial court erred in denying his motion to set aside the verdicts. Furthermore, appellant argues that the trial court erred in denying his requested subpoenas directed towards the Commonwealth's attorneys.

Appellant's arguments are without merit. At trial, the Commonwealth elicited the testimony which appellant contends was withheld. Furthermore, the evidence supports the trial court's finding that the witness did not commit perjury. Accordingly, the trial court did not err in denying appellant's motion to set aside the verdicts nor in denying his requested subpoenas. Therefore, this Court affirms.

## I. BACKGROUND

"When reviewing a trial court's decision on appeal, we view the evidence in the light most favorable to the prevailing party, granting it the benefit of any reasonable inferences." Congdon v. Congdon, 40 Va. App. 255, 258 (2003). So viewed, the evidence is as follows:

The victim, Heather Ciccone, was murdered on December 6, 2015. In the weeks preceding her murder, Ciccone was involved in a dispute with Danielle Long. Long had a child with and remained romantically involved with Joshua Williams (aka "Face"), who was a member of the G-Shyne Bloods gang. Long began threatening Ciccone after she learned that Ciccone was also involved in a romantic relationship with Williams. On at least one occasion, Long went to Ciccone's father's house and "threaten[ed] to kick the crap out of [Ciccone]." She also began making social media posts claiming, amongst other things, that Ciccone had given Williams a sexually transmitted disease.

Toward the end of November, 2015, Ciccone told her friends that she "was done with it" because "[s]he was tired of the drama." Ciccone stated that she "was trying to fall back from [Williams] and was trying to stop talking to him." Ciccone also told Williams that she wanted to meet with Long and end the dispute. One of Ciccone's friends spoke with Long on November 23, 2015, in an effort to de-escalate the situation. Long responded by telling her to "stop trying to be that hoe mouthpiece" and then sent a photograph of Ciccone's house and multiple videos of her waiting in front of Ciccone's house.

In the interim, Ciccone was attempting to facilitate a drug transaction with Deandre Scott (aka "Lego"). Scott had approached Ciccone about purchasing one-half of a pound of marijuana. In early December, Ciccone informed Scott that she had found somebody who would sell him one-half of a pound of marijuana. She did not tell Scott who that individual was, but said that it was "somebody that she's cool with, close with . . . somebody that trusted her to get it, [sell it to Scott], and then she would take the money back [to them]." On December 6, 2015, Ciccone told Scott that she would be picking up the marijuana that evening. The two planned to meet at Scott's apartment afterwards to make the sale. Ciccone texted Scott at 10:56 that evening to tell him that she was "getting it now."

Rondall Shiflett lived in a secluded home on Piney Branch Road in Spotsylvania. Shiflett's house was on a hill, and its driveway was approximately 750 feet long. At approximately 11:00 p.m. on December 6, 2015, Shiflett's wife noticed the headlights of a vehicle entering her driveway. A second vehicle was also in the driveway with its lights on. After stopping in the driveway for a short period of time, the first car pulled out and left. Shiflett went to investigate the remaining vehicle and found Ciccone slumped over in the driver's seat. Believing that she may be passed out from drinking, Shiflett called the police. The responding

officers determined that Ciccone had died after being shot at an indeterminate range in the posterior right side of her head. There was no evidence of a struggle.

Subsequent investigation developed Williams and appellant as suspects. Law enforcement examined the cellular telephone records of multiple phones associated with Williams and appellant. Williams' cell phone records showed that it was in a residential area only a short distance away from the murder scene earlier in the evening. However, his cell phone was turned off at approximately 10:06 p.m. the night of the murder. Appellant's cell phone was never recovered. Analysis of a "burner" phone associated with appellant showed it was located in the same residential area. This "burner" phone was likewise turned off at 9:52 p.m. Analysis of an additional "burner" phone associated with both Williams and appellant also revealed it to be in the same residential area. Between 10:06 and 11:00 p.m., the approximate time of the murder, the second "burner" phone had five communications with Ciccone's phone.

Following the murder, appellant spoke with multiple people about Ciccone's death. Appellant opined that "the bitch got what she deserved" but threatened people not to bring up her name in front of him. While speaking to a close friend, appellant "pretty much confirmed that . . . [Williams] had something to do with" Ciccone's murder and that "somebody gave him a ride." Appellant also told his friend that Williams had "let [him] in his circle, the little organization he has . . . ."

After the date of the murder but prior to being indicted for it, appellant was incarcerated at the Rappahannock Regional Jail. During his time at the Rappahannock Regional Jail, appellant received a new tattoo. Appellant entered the jail with a tattoo of "703" on his right hand. While there, appellant had five five-pointed stars, two bullet casings, and a bullet hole

added around the "703" tattoo. The number five—as well as five-pointed stars—is symbolically significant to Blood gangs and is used to indicate gang affiliation.

The Commonwealth presented six witnesses who testified about what appellant had told them while they were fellow prisoners. The first, Talmadge Burks, was temporarily in a holding cell next to appellant at the Spotsylvania County courthouse. Although Burks did not know appellant, appellant identified himself as Williams' co-defendant for the murder of Ciccone. Appellant then accused Burks of "snitching on him and his homeboy for doing what they did." Burks responded by "asking him if he was proud of what he did." Appellant got upset and continued to harass Burks for being a "snitch" while Burks continued to provoke appellant's reflections on his guilt. After an hour or two of arguing, appellant requested to be moved to a different holding cell. On December 24, 2017, Burks wrote a letter to the Commonwealth's Attorney complaining, *inter alia*, about being placed next to appellant "who bragged to me through the wall about how he killed [Ciccone]."

The remaining five witnesses were all fellow inmates of appellant during the time he was confined at Rappahannock Regional Jail. Jovan Paige, a prisoner in the same pod, saw appellant pacing in the pod and thought that appellant was trying to find somebody with whom to speak. Paige identified himself as a G-Shyne Blood member and asked appellant "what was going on." Appellant told Paige that "I just see her eyes . . . her eyes, I keep seeing it, I keep seeing it in my sleep." Appellant told Paige that he "hit her in the back of the head" and that it was a "730 peter roll"—a term used by G-Shyne Blood members to refer to an execution. Appellant told Paige that he had made a "bargain" with Williams that if he killed Ciccone, Williams would make him a member of the G-Shyne Bloods. Appellant repeatedly asked Paige whether he thought Williams would "uphold his bargain."

Ezra Randall shared a cell with appellant for a month at the Rappahannock Regional Jail. At one point early on, while Randall was reading his Bible, appellant commented that "I will never be like you. God would never accept me . . . I shot her." After a while, appellant began talking to Randall more about the murder. He told Randall that Williams was romantically involved with Ciccone and that once Long found out she told Williams that "he needed to get rid of her." Appellant "basically opened up to" Randall that "he shot her, and it was killing him inside" because "he couldn't live with himself mentally." He also questioned whether Williams "was going to hold with his loyalty towards him." The day Randall was scheduled to leave that cell, appellant gave him a list of names to "check on" because he thought those people were cooperating with the police in the investigation of Ciccone's murder.

Appellant often spoke with Steven Williams ("Steven"), a prisoner in the cell next to his. Anthony Digges was Steven's cellmate and often overheard appellant's conversations with Steven. Both testified about one particular conversation where appellant was "mentally broken down" and approached Steven to discuss whether he should seek mental health treatment. Appellant said that he was "having dreams from when he shot the girl, Heather, in the car." Appellant explained that Long wanted Ciccone dead for sleeping with Williams and giving him an STD that was transmitted to Long. Appellant said that he had agreed to kill her "for initiation into a G-Shyne Blood gang." Appellant described the murder, saying that Ciccone was driving the vehicle with him in the passenger seat and Williams and Long in the rear seats. Appellant said that shortly after they turned down a remote road "he reached over with a pistol, shot her in the back of the head, and then left the scene." Appellant stated that this was pre-planned. After Ciccone pulled off to a remote road, "when [Williams] exited the vehicle that was his cue to shoot her and then exit the vehicle himself."

Tristan Wargas also had several conversations with appellant over the course of multiple months. During those conversations, appellant spoke about shooting Ciccone. Wargas told appellant to "keep quiet, don't talk anymore" to people in the pod about what happened because somebody would relay those conversations to law enforcement. In March 2017, before Wargas spoke to law enforcement, but after appellant was indicted for the murder of Ciccone, Wargas wrote a letter to a different inmate complaining that appellant was an "idiot" for always talking to other people in the jail about murdering Ciccone. Wargas was the only witness to testify as to when appellant got the five five-pointed stars, bullet casings, and bullet hole tattoos on his hand.

During the Commonwealth's direct examination of Wargas, it elicited that Wargas had previously been convicted of twenty-eight felonies; including multiple convictions for crimes of moral turpitude. Wargas testified that, at the time, he had an active fifteen-year sentence, three years of which arose from a probation violation in Spotsylvania County. The following exchange then occurred:

> Q[uestion:] And it's possible that you could have a portion of that sentence reconsidered; is that true?
> A[nswer:] Yes, I believe so.
> Q[uestion:] You've not been promised anything?
> A[nswer:] No, I have not.
> Q[uestion:] To come here and testify?
> A[nswer:] No, I have not.

Wargas clarified that law enforcement had previously asked him to testify, but that he had refused despite law enforcement noting that they may be able to assist him with having his sentence reconsidered. Wargas stated that he changed his mind and decided to testify as a way of making some amends:

> I've done a lot of wrong in my life, I'm trying to make some amends, maybe this will help get the family some closure, some closure that without this testimony might not give them closure, that the man might walk free because of not having this testimony.

Following his jury trial, appellant was convicted of first-degree murder, use of a firearm during the commission of a felony, and conspiracy to commit first-degree murder. The trial court sentenced appellant to a life sentence for the murder charge plus five years' incarceration for the conspiracy charge and three years' incarceration for the firearm charge.

On July 23, 2018—after appellant's sentencing hearing—the Commonwealth disclosed to appellant a letter it received from Wargas regarding a motion to reconsider his sentence, which included the following passage:

> I know you're happy with the life sentence Vajerono [sic] got. I hope you were pleased with my testimony. I hope I truly made a difference in the case. . . . Now I know I said I wasn't going to reach out to my lawyer about doing a motion to reconsider my time. Well we both know that was a lie. I have already reached out to my lawyer here in Prince William County.

The Commonwealth also disclosed text messages between two of its attorneys discussing Wargas' letter. In one, the assistant Commonwealth's attorney notes that he "had already reached out to [Wargas'] attorney about reconsidering his sentence before getting his letter." He further explained that:

> When we talked to him before trial, we talked about him being eligible for a motion to reconsider. We told him we'd take a look at getting his sentence reconsidered, if possible. We didn't talk about who would reach out to his attorneys or how it would happen or anything like that. . . . We told him we wanted to do right and we'd try to keep his name out of the paper and treat him fair with reconsidering his sentence, if he wasn't shipped off to DOC immediately after the trial.

The Commonwealth subsequently disclosed a second letter from Wargas, received in 2018, which was dated "August 23." The second letter accused the Commonwealth of asking him to lie:

> So since you want to do me wrong I will tell everything you made me say. You lied to me about doing me a solid with my cases. So now I recant my testimony. You [] told me to say Vajerono [sic] killed Heather at his murder trial. I wish I never would have

- 8 -

> listened to you and believe you would help me with my sentences,
> for all I know you told other people to lie for you. For all I know,
> Vajerono [sic] is innocent. I am changing my life. This is me
> doing right. Change your ways and stop trying to condemn
> innocent people.

Based on these disclosures, appellant moved to set aside the verdicts. Appellant also sought to subpoena three of the assistant Commonwealth's attorneys to testify regarding the motion. The trial court denied appellant's request to issue the subpoenas but also "order[ed] that [the three assistant Commonwealth's attorneys] be present in the courtroom in the event that [appellant] has evidence or wants someone to identify or not identify one of the attorneys in this case." After a hearing, the trial court also denied appellant's motion to set aside the verdict, finding that Wargas did not perjure himself and holding that the Commonwealth made its disclosures appropriately.

This appeal followed.

## II. ANALYSIS

Appellant argues that the trial court erred for four related reasons. First, appellant contends that the Commonwealth violated his due process rights under Brady v. Maryland, 373 U.S. 83 (1963), by failing to disclose the Wargas impeachment evidence. Concomitantly, appellant avers that the Commonwealth violated his due process rights under Napue v. Illinois, 360 U.S. 264 (1959),[1] by failing to correct Wargas' allegedly false testimony. Appellant contends that the trial court compounded these errors when it denied his motion to set aside the verdicts. Lastly, he argues that the trial court erred when it quashed his subpoenas to the Commonwealth's attorneys. Each lacks merit.

---

[1] Although appellant argues generally that his due process rights were violated, he relied solely on Brady, Napue, and their progeny in his arguments to both the trial court and this Court. To the extent that appellant attempts to raise any other free-standing due process arguments, such arguments are procedurally defaulted for failure to raise them below and adequately develop them before this Court. See Rules 5A:12, 5A:18, and 5A:20.

A.  Alleged <u>Brady</u> Violation

1.  <u>Standard of Review</u>

When reviewing alleged constitutional violations, "[w]e review the trial court's findings of historical fact only for 'clear error,' but we review *de novo* the trial court's application of defined legal standards to the particular facts of a case [. . .] ."  <u>Castillo v. Commonwealth</u>, 70 Va. App. 394, 466 (2019) (quoting <u>Doss v. Commonwealth</u>, 59 Va. App. 435, 455 (2012)) (alteration in original).

2.  <u>Analysis</u>

Appellant contends that the Commonwealth failed to disclose that it spoke with Wargas regarding the possibility of reconsidering his sentence after appellant's trial.  Appellant contends that this failure violates his due process rights.  This Court disagrees.

"Under <u>Brady</u>, 'the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.'"  <u>Mercer v. Commonwealth</u>, 66 Va. App. 139, 146 (2016) (quoting <u>Brady</u>, 373 U.S. at 87).  To establish a <u>Brady</u> violation, a defendant must establish that:

> a) The evidence not disclosed to the accused must be favorable to the accused, either because it is exculpatory, or because it may be used for impeachment; b) the evidence not disclosed must have been withheld by the Commonwealth either willfully or inadvertently; and c) the accused must have been prejudiced.

<u>Hicks v. Dir., Dep't of Corr.</u>, 289 Va. 288, 299 (2015) (quoting <u>Workman v. Commonwealth</u>, 272 Va. 633, 644-45 (2006)).

"A defendant cannot simply allege the presence of favorable material and win reversal of his conviction.  Rather, [he or she] must prove the favorable character of evidence he [or she] claims has been improperly suppressed.  Speculative allegations are not adequate."  <u>Castillo</u>, 70 Va. App. at 466 (quoting <u>Coley v. Commonwealth</u>, 55 Va. App. 624, 630 (2010)) (alterations in

original).  To satisfy the prejudice prong, a defendant must demonstrate that "there is a reasonable probability that, had the evidence been disclosed, the result of the proceedings would have been different."  Commonwealth v. Tuma, 285 Va. 629, 635 (2013) (quoting Smith v. Cain, 565 U.S. 73, 75 (2012)).  "A reasonable probability does not mean that the defendant 'would more likely than not have received a different verdict with the evidence,' only that the likelihood of a different result is great enough to 'undermine[ ] confidence in the outcome of the trial.'"  Cain, 565 U.S. at 75 (quoting Kyles v. Whitley, 514 U.S. 419, 434 (1995)).

Furthermore, "Brady is 'a disclosure rule, not a discovery rule.'"  Tuma, 285 Va. at 635 (quoting United States v. Higgins, 75 F.3d 332, 335 (7th Cir. 1996)).  Accordingly, "Brady is not violated, as a matter of law, when impeachment evidence is made 'available to [a] defendant[ ] during trial' if the defendant has 'sufficient time to make use of [it] at trial.'"  Tuma, 285 Va. at 635 (quoting Read v. Virginia State Bar, 233 Va. 560, 564-65 (1987)).  "This principle applies without regard to when the prosecution was or should have been 'aware of the information.'"  Id. at 636 (quoting Read, 233 Va. at 564).

This Court considers whether evidence is favorable to the defendant and whether it was suppressed on an item-by-item basis.  Lovitt v. Warden, 266 Va. 216, 245 (2003).  Whether defendant was prejudiced by the suppression of favorable evidence is determined by its cumulative effect.  Kyles, 514 U.S. at 436.  However, the Court need not reach the prejudice prong unless the defendant demonstrates that favorable evidence was suppressed.  Tuma, 285 Va. at 635.

Appellant contends that the Commonwealth failed to disclose that it discussed the possibility of a motion to reconsider Wargas' sentence.  However, the testimony elicited by the Commonwealth of Wargas plainly belies this argument.  During direct examination of Wargas, the Commonwealth asked Wargas whether there was a possibility that a portion of his active

sentence could be reconsidered later as a result of his testimony. Wargas admitted that that was true; he only denied that he was promised anything. Therefore, by eliciting the testimony itself, the Commonwealth made such impeachment evidence available to appellant at a point when appellant had sufficient time to make use of it. Accordingly, <u>Brady</u> was not violated as a matter of law. <u>Id.</u> (quoting <u>Read</u>, 233 Va. at 564-65).

### B. Allegedly False Testimony

#### 1. Standard of Review

When reviewing alleged constitutional violations, "[w]e review the trial court's findings of historical fact only for 'clear error,' but we review *de novo* the trial court's application of defined legal standards to the particular facts of a case [. . .] ." <u>Castillo</u>, 70 Va. App. at 466 (quoting <u>Doss</u>, 59 Va. App. at 455) (alteration in original).

#### 2. Analysis

Appellant contends that Wargas lied during his testimony when he stated that he was choosing to testify for altruistic reasons and had not been offered anything. Because the Commonwealth was aware that a motion to reconsider his sentence was a possibility, appellant argues that the Commonwealth violated his due process rights by not correcting Wargas' testimony.

"[A] conviction must be reversed if the state knowingly used false testimony in securing a conviction where the 'false testimony . . . may have had an effect on the outcome of the trial.'" <u>Hash v. Dir. of Dep't of Corrections</u>, 278 Va. 664, 681 (2009) (quoting <u>Napue</u>, 360 U.S. at 272). This applies even if the perjured testimony "only relates to a witness' credibility." <u>Id.</u> To demonstrate a violation of <u>Napue</u>, appellant must prove that (1) the challenged testimony was false, (2) the prosecution knew of the falsity, and (3) the falsity affected the jury's judgment. <u>Teleguz v. Commonwealth</u>, 273 Va. 458, 492 (2007).

The trial court made an explicit finding that Wargas did not perjure himself, and that finding is not plainly wrong. Appellant relies on Wargas' statements that he was not promised anything by the Commonwealth. He juxtaposes these with the Commonwealth's admission that it "told [Wargas] we'd take a look at getting his sentence reconsidered" and would "try to do him a solid." But, neither of these statements are promises. They are conditional, aspirational statements. Indeed, they match Wargas' testimony that, although he wasn't promised anything, he was eligible to have his sentence reconsidered due to his testimony in appellant's case. Therefore, the trial court's finding is supported by the evidence and this Court will not disturb that finding.

## C. Motion to Set Aside the Verdicts

### 1. Standard of Review

Motions to set aside the verdict and grant a new trial are reviewed for abuse of discretion. Whittington v. Commonwealth, 5 Va. App. 212, 215 (1987). When reviewing a trial court's decision for an abuse of discretion, this Court defers to the trial court's judgment and will "not reverse merely because it would have come to a different result in the first instance." Lawlor v. Commonwealth, 285 Va. 187, 212 (2013). Nevertheless, "a trial court 'by definition abuses its discretion when it makes an error of law.'" Auer v. Commonwealth, 46 Va. App. 637, 643 (2005) (quoting Shooltz v. Shooltz, 27 Va. App. 264, 271 (1998)). Thus, the trial court abuses its discretion "when a relevant factor that should have been given significant weight is not considered; when an irrelevant or improper factor is considered and given significant weight; and when all proper factors, and no improper ones, are considered, but the court, in weighing those factors, commits a clear error of judgment." Lawlor, 285 Va. at 213 (quoting Landrum v. Chippenham & Johnston-Willis Hosps., Inc., 282 Va. 346, 352 (2011)).

- 13 -

## 2. Analysis

Appellant's argument that the trial court erred in denying his motion to set aside the verdicts largely tracks his prior arguments that his due process rights were violated. Appellant contends that Wargas' letter and the other evidence disclosed after trial could have been used to attack both the credibility of Wargas and the other five inmates who testified. These arguments are unpersuasive.

A motion to set aside the verdict and grant a new trial based on newly discovered evidence requires four conjunctive requirements: "(1) the evidence was obtained after trial; (2) it could not have been obtained prior to trial through the exercise of reasonable diligence; (3) it is not merely cumulative, corroborative or collateral; and (4) it is material and should produce an opposite result at another trial." Whittington, 5 Va. App. at 215. "The opportunity and temptation for fraud which accompany a motion for a new trial require that such a motion be approached guardedly." Id. "Therefore, such a motion is received cautiously, is awarded with great reluctance, and is addressed to the sound discretion of the trial court." Id.

The trial court determined that the newly discovered evidence failed to satisfy these four requirements. This decision was not an abuse of its discretion. First, the trial court found that Wargas did not perjure himself and, as discussed above, that finding is not plainly wrong. Therefore, whether the Commonwealth and Wargas discussed a motion to reconsider his sentence after his testimony is collateral to Wargas' testimony that appellant confessed to killing Ciccone and got a prison tattoo that commemorated him being initiated into a gang after killing her. Furthermore, the trial court found that, even if the newly discovered evidence wasn't collateral, it was not material in the light of the Commonwealth's other evidence. The Commonwealth's other evidence included cellular data placing appellant near the scene of the crime, testimony from four of appellant's acquaintances outside of prison linking him to

- 14 -

Williams and to Ciccone's murder, and the testimony of five other fellow inmates who heard appellant confess on multiple occasion. Given these circumstances, this Court concludes that the trial court did not abuse its discretion in denying appellant's motion to set aside the verdicts.

### D. Subpoenas

#### 1. Standard of Review

When reviewing alleged constitutional violations, "[w]e review the trial court's findings of historical fact only for 'clear error,' but we review *de novo* the trial court's application of defined legal standards to the particular facts of a case [. . .] ." Castillo, 70 Va. App. at 466 (quoting Doss, 59 Va. App. at 455) (alteration in original).

#### 2. Analysis

Appellant contends that the trial court violated his right to compulsory process by denying his request to subpoena the pertinent Commonwealth' attorneys.[2] This Court disagrees.

"The Sixth and Fourteenth Amendments to the United States Constitution guarantee a defendant in a criminal prosecution the right 'to have compulsory process for obtaining witnesses in his favor.'" Reyes v. Commonwealth, 66 Va. App. 689, 693 (2016) (quoting U.S. Const. amend. VI.) Rule 3A:12(a) governs the issuance of subpoenas in criminal cases and provides that:

---

[2] The Commonwealth contends that this argument is procedurally defaulted. The trial court "order[ed] that they be present in the courtroom in the event that [appellant] has evidence or wants someone to identify or not identify one of the attorneys in this case." At the hearing on the motion to set aside, appellant did not attempt to call any of the attorneys as witnesses. The Commonwealth contends that, by failing to do so, appellant waived his argument regarding the subpoenas. This argument is unavailing. Typically, the purpose of a subpoena is merely to compel the attendance of an expected witness, which was achieved via the trial court's order. However, the trial court's ruling was also clear that it was denying the subpoenas because appellant would not be allowed to call them as witnesses. Therefore, appellant's argument is preserved. Nevertheless, counsel argued their respective positions without proffering further specific facts, leaving the issue of materiality to be decided based on the evidence already presented.

> [N]o subpoena . . . shall be issued in any criminal case . . . which subpoena . . . is directed to a member of the bar of this Commonwealth . . . unless the subpoena request has been approved in all specifics, in advance, by a judge of the circuit court wherein the subpoena is requested . . . . The proceedings for approval may be conducted in camera, in the judge's discretion, and the judge may seal such proceedings."[3]

Furthermore, "[i]n order to assert [a] right to compulsory process, the accused is required to make a plausible showing that the testimony sought would be both material and favorable to his defense." Jones v. City of Virginia Beach, 17 Va. App. 405, 409 (1993) (quoting Howard v. Commonwealth, 6 Va. App. 132, 144 (1988)).

Appellant failed to meet the requisite materiality showing for the same reasons that appellant's other claims fail. Appellant sought to call the assistant Commonwealth's attorneys so that he could question them about telling "[Wargas] we'd take a look at getting his sentence reconsidered" and would "try to do him a solid." However, as discussed above, Wargas did not commit perjury during his testimony. The Commonwealth did not violate Brady or Napue. And, the newly discovered evidence after trial was collateral and immaterial. Accordingly, the testimony of the assistant Commonwealth's attorneys who were the subjects of the challenged subpoenas was likewise immaterial. Therefore, the trial court did not err when it denied appellant's requested subpoenas.

---

[3] At the time appellant requested the subpoenas, Rule 3A:12(a) stated that requests for subpoenas of members of the bar "shall be made by the Commonwealth's attorney for the jurisdiction involved, either on motion of the Commonwealth's attorney or upon request to the Commonwealth's attorney by the foreman of any grand jury." To the trial court, the Commonwealth contended that appellant lacked standing under this rule to request subpoenas directed to members of the bar. Appellant contends that such a rule would violate his constitutional right to compulsory process. Because the trial court did not err in denying appellant's requested subpoenas on other grounds, this Court need not determine the constitutionality of such a rule.

## III.  CONCLUSION

The Commonwealth did not violate <u>Brady</u> because it elicited the testimony appellant says was withheld in time for him to use at trial.  Furthermore, there was no <u>Napue</u> violation because Wargas did not commit perjury.  As a result, the trial court did not err in denying appellant's motion to set aside the verdicts nor his requested subpoenas.  Therefore, this Court affirms.

<u>Affirmed.</u>