PRESENT: Lemons, C.J., Goodwyn, Mims, McClanahan, Powell, and Kelsey, JJ., and Lacy, S.J.

HAROLD CLARKE, DIRECTOR,
VIRGINIA DEPARTMENT OF CORRECTIONS

OPINION BY
v. Record No. 151022      SENIOR JUSTICE ELIZABETH LACY
June 9, 2016

DANIEL GALDAMEZ


FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
Jane Marum Roush, Judge


In this appeal, the Director of the Virginia Department of Corrections asks us to reverse the judgment of the habeas court granting a petition for a writ of habeas corpus because a decision by Daniel Galdamez to reject a plea agreement and proceed to trial could not be rational as a matter of law and, therefore, Galdamez could not satisfy the prejudice prong of Strickland v. Washington, 466 U.S. 668 (1984).

BACKGROUND

In August 2013, while driving his vehicle out of a parking lot onto a multi-lane public roadway, Daniel Galdamez failed to yield to traffic traveling in the northbound lanes. The front of his vehicle struck the right side of the victim's vehicle, causing it to "veer to the left, cross over [a] concrete median[,] and enter [the southbound] lanes." The impact occurred at a right angle, with Galdamez traveling west and the victim traveling north. The police report showed that the collision caused an estimated $4,000 in damage to the front of Galdamez's vehicle and $2,000 in damage to the right side of the victim's vehicle. Galdamez did not stop. He returned to the scene of the accident before the police arrived.

Galdamez was charged with felony hit and run, a Class 5 felony with a maximum sentence of 10 years' imprisonment, Code §§ 18.2-10(e), 46.2-894, and driving while intoxicated

("DWI"), Code §18.2-266.

Galdamez, a native of El Salvador, told his attorney that his priority was not to lose his immigration status in the United States. Galdamez's attorney negotiated a plea agreement with the prosecutor that involved reducing the felony hit-and-run charge to a misdemeanor hit-and-run charge, a Class 1 misdemeanor with a maximum sentence of 12 months in jail, Code §§ 18.2-11(a), 46.2-894. The plea agreement included a stipulated sentence of 180 days of incarceration with 170 days suspended on the hit and run conviction and 90 days, suspended, on the DWI conviction. Galdamez accepted the plea agreement and did not appeal.

In December 2013, the United States Department of Homeland Security notified Galdamez that his Temporary Protected Status ("TPS") would be revoked as a result of his criminal convictions. Under federal immigration regulations, a noncitizen forfeits his TPS after a conviction of either one or more felonies or two or more misdemeanors. See 8 C.F.R. §§ 244.14(a)(1), 244.4(a).

HABEAS CORPUS PROCEEDING

Galdamez instituted this proceeding by filing a petition for a writ of habeas corpus asking for an evidentiary hearing. He alleged that his prior counsel had given him erroneous advice about the effect of his plea agreement on his immigration status and, had he been given accurate information, he would have rejected the plea agreement and gone to trial on the felony hit and run and DWI charges. In addition, he alleged that he had defenses he had discussed with counsel, such as returning to the scene of the accident.

In his affidavit, Galdamez stated a number of reasons why remaining in this country was his priority, including that he is married and has a young child who is a citizen of the United States and for whom he is the sole financial support, all his extended family lives in the United

2

States and, if deported, he would have no place to stay, no family to assist him, few financial opportunities and be subject to the rampant gang crime existing in El Salvador. Galdamez also stated in his affidavit that he spoke with his trial counsel regarding his defenses to the charges "including the fact that he never intended not to stop" and that he was present at the scene of the accident when the police arrived there.

The Director moved to dismiss the petition, arguing that Galdamez had "no viable defenses" to the hit and run charge because he fled from the scene. Therefore, the Director concluded, it would have been irrational for Galdamez to proceed to trial knowing he certainly would face the same immigration consequences and a longer prison term than if he accepted the plea agreement.

The habeas court entered an order granting Galdamez an evidentiary hearing and denying the Director's motion for reconsideration. In its opinion letter granting the evidentiary hearing, the habeas court determined that if Galdamez's allegations regarding his counsel's erroneous advice were true, the performance prong of Strickland would be satisfied. The habeas court also concluded that Galdamez stated a colorable claim of prejudice under Strickland based on his desire to protect his immigration status and, although he "initially fled the scene of the accident," Galdamez alleged "a viable defense" to the hit and run charge and "[i]t is possible that the fact finder, under the totality of the circumstances, would have acquitted Mr. Galdamez of the hit and run charge."

The evidence produced at the evidentiary hearing established that Galdamez had been in this country for 15 years. He had TPS, which allowed him to legally work in this country, enroll in Social Security, and obtain a driver's license and medical insurance. He had maintained a full-time job as a painter for six years and had no other criminal record.

3

Galdamez testified that he did not know he was in an accident until he arrived at his destination, that when he "got out of the car" he realized he had hit something, that he "return[ed] immediately after" he realized that his car had been damaged, that he was gone from the scene for approximately 12 to 15 minutes and returned to the scene before the police arrived.

Galdamez testified that he wanted to protect his immigration status and remain in the United States because his wife and young daughter are here, that he is the sole financial support for his daughter, all his extended family is in the United States, that he would have no financial opportunities in El Salvador and he did not want to return to El Salvador because of the gangs and corruption and he feared for his safety. He also testified, consistent with his allegations, that he told his prior counsel that his "priority was not to lose his TPS status" and "to stay with his daughter and family" and that his prior counsel had advised him that his immigration status would not be adversely affected should Galdamez accept the plea agreement.

The habeas court found Galdamez to be credible and ruled that his prior attorney had given Galdamez erroneous advice regarding the plea agreement's impact on Galdamez's immigration status and that, had Galdamez been properly advised, he would have rejected the plea agreement and gone to trial. The habeas court also stated that it was "possible that the fact finder, under the totality of the circumstances, would have acquitted Mr. Galdamez of the hit and run charge." The habeas court concluded that if Galdamez had been properly advised, his decision to reject the plea agreement and go to trial would have been a rational decision, thereby satisfying the performance and prejudice prongs of Strickland. The habeas court granted the writ and vacated Galdamez's convictions, and remanded the case for further proceedings.

The Director filed this appeal in which he challenges only the habeas court's holding that Galdamez satisfied the prejudice prong of Strickland.

4

ANALYSIS

To satisfy Strickland's prejudice prong in circumstances involving counsel's deficient performance in conjunction with plea agreements, a defendant must show a reasonable probability that but for counsel's erroneous advice, the defendant would have rejected the plea agreement and proceeded to trial and that such a choice would be rational under the circumstances. Hill v. Lockhart, 474 U.S. 52, 57 (1985). In extending the Sixth Amendment protection of effective assistance of counsel to instances in which the plea agreement could impact a noncitizen's immigration status including possible deportation, the United States Supreme Court remarked that maintaining one's right to remain in this country "may be more important to the client than any potential jail sentence." Padilla v. Kentucky, 559 U.S. 356, 368 (2010); see also Zemene v. Clarke, 289 Va. 303, 768 S.E.2d 684 (2015). Thus in such cases, the significance of the immigration consequences of a plea agreement to the defendant is a legitimate part of the circumstances to be considered in the prejudice analysis, particularly whether the decision to reject a proposed plea agreement and proceed to trial is rational.

The Director contends that Code § 46.2-894, the hit and run statute, is violated if the driver involved in an accident resulting in property damage does not "immediately" stop at the scene of the accident. Because Galdamez admits he did not "immediately" stop at the scene of the accident, "as a matter of law, [Galdamez] would have been convicted had he gone to trial." Therefore, the Director contends a decision to reject the plea agreement could not, under these circumstances, be rational as a matter of law and, therefore, the habeas court erred in finding that Galdamez satisfied the prejudice prong of Strickland. We disagree.

The evidence before the habeas court, including the testimony of Galdamez, demonstrates that there were a number of factual issues that could have been contested or tested

5

had the case gone to trial.* As the Director acknowledges in his brief to this Court, the hit and run statute has four elements, each of which must be established by the Commonwealth beyond a reasonable doubt to secure a conviction. To convict a defendant of a violation of that statute the jury or fact-finder must find: (1) that the defendant was the driver of a vehicle that he knew was involved in an accident; and (2) that the accident caused property damage or bodily injury; and (3) that the defendant knew or should have known that property was damaged by the accident; and (4) that the defendant failed to do any of the following: (a) stop immediately, (b) render reasonably necessary assistance, or (c) report his identification information to law enforcement or the other person involved in the accident. Payne v. Commonwealth, 277 Va. 531, 544-45, 674 S.E.2d 835, 842 (2009); Herchenbach v. Commonwealth, 185 Va. 217, 220, 38 S.E.2d 328, 329 (1946); Johnson v. Commonwealth, 14 Va. App. 769, 772, 418 S.E.2d 729, 731 (1992); Dawson v. Commonwealth, Record No. 0220-11-4, 2011 Va. App. LEXIS 413, at *10-12 (December 28, 2011)(unpublished); Jones v. Commonwealth, Record No. 0863-97-2, 1998 Va. App. LEXIS 674, at *14-15 (December 22, 1998) (unpublished).

In Herchenbach, we held that

> [k]nowledge necessarily is an essential element of the crime . . . . [I]n order to be guilty of violating the statute, "the driver must be aware that harm has been done; it must be present in his mind that there has been an injury; and then, with that in his mind, he must deliberately go away without making himself known."

Id. at 220, 38 S.E.2d at 329. In that case, the defendant, a bus driver, was convicted of violating the hit and run statute under former Code § 2154(104) (now Code § 46.2-894). A person lying

---

* We review the record in the light most favorable to the prevailing party, Galdamez, according him the benefit of all reasonable inferences deducible therefrom in determining whether the circuit court was wrong as a matter of law in concluding that Galdamez had a valid defense. Horton v. Horton, 254 Va. 111, 115, 487 S.E.2d 200, 203 (1997).

6

next to a motorbike with a flat tire with his body extended into the roadway was run over by a bus the defendant was driving. The defendant did not stop, but continued his route, discharged his passengers, returned the bus to the station and went home. An investigation led the police to the bus station where they discovered hair and blood on the bus tire, which led to a warrant for the bus driver's arrest that the police executed at the driver's home several hours after the accident occurred. Herchenbach appealed his conviction and argued to this Court that the Commonwealth failed to prove that he knew his bus had been involved in an accident. This Court held that the conceded facts, that the body was lying in the roadway and testimony of witnesses that the bus drove over the person's head were "not sufficient to establish one essential element of the offense, to-wit, that the accused knew his bus had struck [the] decedent." Id. at 221, 38 S.E.2d at 330. The conviction was reversed. See also Tooke v. Commonwealth, 47 Va. App. 759, 766-67, 627 S.E.2d 533, 536-37 (2006) (holding actual knowledge is an element of the hit and run crime); Gormus v. Commonwealth, Record No. 0982-99-3, 2000 Va. App. LEXIS 317, at *13-14 (May 2, 2000) (unpublished) (same).

Galdamez, in his affidavit, his testimony at the evidentiary hearing, and his counsel's argument before this Court, contended that Galdamez did not know that he was in an accident until he arrived at his destination. In his affidavit Galdamez stated he "never had the intent to fail to stop." At trial he testified that when he arrived at his friend's house and "got out of the car, [he] realized that well, I [had] to [have] hit something. It had [to have] been something more serious than I thought and I returned immediately to the scene" and that he returned "immediately after [he] realized that [his] car had been damaged." The schematic of the incident as reflected on the police report in the record shows that Galdamez proceeded with a left turn and the other vehicle proceeded in the opposite direction, which could have made it possible that

7

Galdamez did not see the path of the other car. There is evidence to support the conclusion that whether Galdamez "knew or should have known" that he was involved in an accident was an issue of fact to be resolved by the fact-finder at trial -- an opportunity Galdamez was denied.

Similarly, the dollar amount of damage to the vehicles was the estimate of the police officer. There were no photographs of the vehicles and no opportunity to test the actual extent and cost of the damage inflicted. The estimates of damage, although in the thousands of dollars, are not conclusive regarding the damage that resulted. It is possible, given the expense of car repairs generally, that the damage was not particularly extensive, despite the estimated costs of car repairs. The police officer's estimated damage amount is insufficient in this context to decide, as a matter of law, that the damage was significant enough to demonstrate that Galdamez's testimony that he was not aware of the incident until he exited the car was inherently incredible. At trial, that would be a fact issue for the fact-finder to determine.

We do not dispute that the hit and run statute requires a defendant to stop "immediately." However, that requirement is predicated on the defendant knowing he was involved in an accident that he knew or should have known involved personal injury or property damage. Galdamez's concession that he did not stop "immediately" at the scene of the accident but proceeded to a friend's house before he returned to the scene, is not a concession that he knew he was in an accident causing personal injury or property damage. The Director's contention that Galdamez had no legally viable defense to the hit and run charge because he did not stop "immediately" at the scene is based on a limited slice of evidence and ignores the elements of proof that the Commonwealth would have to prove at trial under the statute as well as Herchenbach and its progeny.

8

Where, as here, there has been an evidentiary hearing in a habeas corpus case, the habeas court's factual findings are entitled to deference and are binding on this Court unless those findings are plainly wrong or without evidence to support them. Velasquez-Lopez v. Clarke, 290 Va. 443, 448, 778 S.E.2d 504, 507 (2015). The habeas court's findings and conclusions are subject to review to determine whether the court correctly applied the law to the facts. Dominguez v. Pruett, 287 Va. 434, 440, 756 S.E.2d 911, 914 (2014) (quoting Hash v. Director, Dep't of Corr., 278 Va. 664, 672, 686 S.E.2d 208, 212 (2009)); See Curo v. Becker, 254 Va. 486, 489, 493 S.E.2d 368, 369 (1997). According to well-established Virginia precedent, an appellate court will affirm a trial court's judgment unless it appears from the evidence that the judgment is plainly wrong or without evidence to support it. Cardinal Dev. Co. v. Stanley Constr. Co., 255 Va. 300, 302, 497 S.E.2d 847, 849 (1998); Code § 8.01-680.

The habeas court concluded the evidence supported Galdamez's contention that had he been properly advised, he would have rejected the plea agreement and gone to trial, and that the decision to do so was rational in light of all the circumstances. Our review of the record demonstrates that it supports those findings: Galdamez demonstrated that he had a strong desire to and a basis for wishing to maintain his immigration status and remain in this country, a position he conveyed to his prior attorney prior to accepting the plea agreement. His evidence supported a finding that, if properly advised, Galdamez would have rejected the plea agreement and proceeded to trial. The evidence further supported a finding that a fact-finder could have found him not guilty of the hit and run offense. The record therefore supports the judgment of the trial court that a decision by Galdamez to reject the plea agreement and proceed to trial would have been a rational decision. The judgment of the habeas court is not plainly wrong or without evidence to support it.

9

Accordingly, the judgment of the habeas court is affirmed.

Affirmed.

JUSTICE KELSEY, with whom CHIEF JUSTICE LEMONS and JUSTICE McCLANAHAN join, dissenting.

Daniel Galdamez, a drunk driver, T-boned the victim's vehicle and caused it to veer to the left, cross over a concrete median, and enter lanes of oncoming traffic. The wreck produced an estimated $4,000 in damages to his vehicle and $2,000 in damages to the victim's vehicle. Instead of stopping to see if the victim was injured, Galdamez fled the scene of the accident and drove to a friend's house where, by his own testimony, he consumed alcohol. About fifteen minutes later, his friend drove him back to the accident scene where he was later arrested. The arresting police officer described him as "obviously drunk." J.A. at 55.

The majority concludes that a reasonable jury "could have found [Galdamez] not guilty of the hit and run offense." Ante at 10. A jury could come to such a conclusion, the majority reasons, by finding that "Galdamez did not know that he was in an accident" until after he got to his friend's house. Ante at 7. I respectfully disagree. A rational jury could not come to that conclusion because it simply defies common sense. The only way Galdamez could have been unaware that he had collided with another vehicle would be because he was too drunk to appreciate the obvious — and that supposition, even if true, would not exonerate him as a matter of law.

I.

Unlike the typical civil case, a habeas court may consider any "recorded matters," including records from the prior criminal trial that resulted in the challenged conviction. See Code § 8.01-654(B)(4). In addition, Code § 8.01-657 permits the habeas court to take evidence

10

of "unrecorded matters of fact relating to any previous judicial proceeding," which would include ore tenus testimony presented at an evidentiary hearing. Finally, Code § 8.01-660 grants the habeas court discretion to consider "affidavits of witnesses" as substantive evidence. See generally Smith v. Brown, 291 Va. 260, 264, 781 S.E.2d 744, 747 (2016). Our appellate review, therefore, takes into account all three subsets of the habeas court's record.

In August 2013, while driving his vehicle out of a parking lot onto a multi-lane public roadway, Galdamez failed to yield to traffic traveling in the northbound lanes. The front of his vehicle struck the right side of the victim's vehicle, causing it to "veer to the left, cross over [a] concrete median[,] and enter [the southbound] lanes." J.A. at 57. The impact occurred at a right angle, with Galdamez traveling west and the victim traveling north. Id. No fog, mist, rain, snow, sleet, or anything else "[o]bscured" Galdamez's view of the roadway. Id. at 55-56. The collision occurred at night on a "[l]ighted" roadway. Id. at 56.

The habeas court's letter opinion denying a motion to dismiss recounted the "Factual Background" of the case. Id. at 62. "The record in this case," the court stated, revealed "the following facts." Id.[1] The court found that Galdamez "initially *fled* the scene of the accident"

---

[1] The habeas court's factual findings in its letter opinion were based on the "recorded matters," Code § 8.01-654(B)(4), including records from the prior criminal trial that resulted in the challenged conviction, and the "affidavits of witnesses." Code § 8.01-660. The habeas court never expressly retracted these factual findings. Nor can it be fairly inferred that the court implicitly retracted them by granting Galdamez an evidentiary hearing under Code § 8.01-657.

The court granted the evidentiary hearing "so that the *factual dispute about the specific advice he received* can be resolved" by the court after hearing additional testimony. J.A. at 68-69 (emphasis added). The court limited the evidentiary hearing to the "factual dispute" surrounding the "specific advice" given by Galdamez's former counsel because the court had already concluded: "*If* Mr. Galdamez had been properly advised, his decision to reject the plea agreement and go to trial would have been rational." Id. at 68 (emphasis added). The court repeated this conclusion in the order denying the Commonwealth's motion to reconsider. Id. at 79 (concluding that, "had the Petitioner been properly advised, his decision to reject the plea offer and take his chances at trial would have been rational").

11

and drove to a friend's home. Id. at 63 (emphasis added). While there, his friend "persuaded" Galdamez "to return to the scene," id., and later drove him back to the place where the accident had occurred. A police officer at the accident scene deemed Galdamez "obviously drunk," id. at 55, and charged him with driving while intoxicated and felony hit-and-run.

Galdamez estimated his return to be approximately fifteen minutes after he had fled the scene of the accident. Id. at 129. At some point after the accident but before his arrest, Galdamez admitted that he had engaged in "post-driving alcohol consumption." Id. at 21 (affidavit), 126 (reaffirming his affidavit). Placing this fact within his overall narrative, this means that Galdamez drank alcohol at his friend's home after the accident and/or during the trip back to the accident scene.

The collision caused an estimated $4,000 in damage to the front of Galdamez's vehicle and $2,000 in damage to the right side of the victim's vehicle. Id. at 54, 57. The arresting officer examined the vehicles and marked the following "Impact Area(s)" along the entire right side of the victim's vehicle and the entire front of Galdamez's vehicle:



Id. at 57. The officer's diagram of the crash site depicted the paths of both vehicles, with Galdamez identified as "Unit 2" and the victim as "Unit 1":

CRASH DIAGRAM



Id. At no point in the habeas court proceedings or on appeal has either party disputed the officer's factual depiction of the accident scene or the visible damage to both vehicles listed in the report.

The record also reveals that, prior to his criminal trial, Galdamez's attorney negotiated a plea agreement with the prosecutor that involved dropping the felony hit-and-run charge (a Class 5 felony with a maximum sentence of ten years, Code §§ 18.2-10(e), 46.2-894) to a misdemeanor hit-and-run charge (a Class 1 misdemeanor with a maximum sentence of twelve months, Code §§ 18.2-11(a), 46.2-894). The plea agreement included a stipulated sentence of ten days of incarceration on the hit-and-run conviction (180 days with 170 suspended) and no active incarceration at all for the DWI conviction (90 days fully suspended). After Galdamez accepted the deal, the general district court approved the plea agreement, convicted Galdamez for the two misdemeanors, and imposed the agreed-upon sentences.

13

In December 2013, the United States Department of Homeland Security notified Galdamez, a citizen of El Salvador, that his Temporary Protected Status ("TPS") would be revoked as a result of his criminal convictions. Under federal immigration regulations, a noncitizen forfeits his TPS after a conviction of either *one* or more felonies or *two* or more misdemeanors. See 8 C.F.R. §§ 244.14(a)(1), 244.4(a).

In response, Galdamez filed a habeas corpus petition claiming that his prior counsel had failed to give him competent advice about the effect of his plea agreement on his immigration status. According to Galdamez, counsel had allegedly told him that convictions of two misdemeanors arising out of the same incident would not trigger the forfeiture of his TPS. Had he known this advice was inaccurate, Galdamez claimed, he would have rejected the plea agreement and gone to trial on the felony hit-and-run charge and the misdemeanor DWI charge.

It would have made sense for him to go to trial, Galdamez argued, because he believed that he had a viable defense to the DWI charge as his "post-driving alcohol consumption," J.A. at 21, would explain his blood alcohol content upon his arrest. In addition, Galdamez believed that he could assert a viable defense to the felony hit-and-run charge because, after he had hit the victim's vehicle and had fled the accident scene, he returned about fifteen minutes later. Id. at 129.

At the habeas evidentiary hearing, scheduled by the court to resolve "the factual dispute about the specific advice [that Galdamez had] received," id. at 68, Galdamez's former counsel testified that he had represented hundreds of noncitizens in the criminal courts and understood his obligation to provide advice on the effect of plea agreements on an accused's immigration status. Though counsel doubted that he had told Galdamez what Galdamez claimed he heard, counsel admitted that he could not specifically recall the conversation about Galdamez's TPS.

14

Counsel testified that he believed Galdamez had no viable defense to the DWI misdemeanor charge. Counsel also informed Galdamez that "there was no way he could win the felony" hit-and-run case, id. at 157, given the uncontradicted evidence proving that "he clearly left the scene of an accident," id. at 145. Thus, from counsel's perspective, reducing the felony hit-and-run to a misdemeanor was the only favorable result he could obtain for Galdamez. Id. Under counsel's reasoning, Galdamez's immigration status would be jeopardized whether he pleaded guilty or went to trial. Counsel speculated, however, that he may have "wondered out loud whether any argument could be made [later] concerning the fact that both misdemeanors arose out of the same event." Id. at 153-54.

The habeas court found the performance of Galdamez's counsel was deficient because he had failed to make clear the effect of the convictions on Galdamez's immigration status. On the separate issue of prejudice, the habeas court held that Galdamez did not have "any defenses" to the misdemeanor DWI charge. Id. at 167. Consequently, it would not have made any difference if Galdamez had pleaded guilty to the DWI charge.

On the felony hit-and-run charge, however, the habeas court held that Galdamez had "a very valid defense to the felony hit and run" because, after fleeing from the scene of the accident, he "returned" approximately fifteen minutes later, id. at 164-65, in enough time to make his "presence known" to the police arriving on the scene, id. at 171. On this basis, the habeas court granted a writ of habeas corpus, vacating both the DWI and hit-and-run convictions.

II.

On appeal, the Commonwealth argues that the habeas court erred as a matter of law. Under settled principles of habeas law, the Commonwealth contends, Galdamez's arguments and the habeas court's reasoning are legally insufficient to establish prejudice. I agree.

15

A.

The prejudice standard governing habeas cases is a type of "but-for-causation principle" that requires a showing that counsel's incompetent representation actually resulted in a legally cognizable harm. Smith, 291 Va. at 266-67, 781 S.E.2d at 748-49. In the typical case involving a collateral attack on a guilty plea, a habeas claimant must prove "a reasonable probability that, but for counsel's errors, [the defendant] would not have pleaded guilty and would have insisted on going to trial." Premo v. Moore, 562 U.S. 115, 131-32 (2011) (quoting Hill v. Lockhart, 474 U.S. 52, 59 (1985)).

That standard, however, "does not imply, much less require, that a habeas court should simply accept at face value a petitioner's after-the-fact allegation on this issue." Smith, 291 Va. at 267, 781 S.E.2d at 748. A defendant's "subjective preferences" do not govern; "what matters is whether proceeding to trial would have been objectively reasonable" under the facts and governing law. United States v. Fugit, 703 F.3d 248, 260 (4th Cir. 2012). Thus, a habeas claimant "cannot make that showing merely by telling the court now that he would have gone to trial then if he had gotten different advice." Christian v. Ballard, 792 F.3d 427, 452 (4th Cir. 2015) (alterations and citation omitted), cert. denied, ___ U.S. ___, 136 S. Ct. 342 (2015).[2]

Instead, as the leading United States Supreme Court case explains, "[i]n many guilty plea cases, the 'prejudice' inquiry will *closely resemble* the inquiry engaged in by courts reviewing ineffective-assistance challenges to convictions obtained through a trial." Hill, 474 U.S. at 59

---

[2] See also United States v. Watson, 766 F.3d 1219, 1226 (10th Cir. 2014), cert. denied, ___ U.S. ___, 135 S. Ct. 735 (2014); Heard v. Addison, 728 F.3d 1170, 1184 (10th Cir. 2013); Pilla v. United States, 668 F.3d 368, 373 (6th Cir. 2012); United States v. Clingman, 288 F.3d 1183, 1186 (10th Cir. 2002); Miller v. Champion, 262 F.3d 1066, 1072 (10th Cir. 2001); Holmes v. United States, 876 F.2d 1545, 1551 n.7 (11th Cir. 1989); Hooper v. Garraghty, 845 F.2d 471, 475 (4th Cir. 1988); Key v. United States, 806 F.2d 133, 139 (7th Cir. 1986); Bonvillain v. Blackburn, 780 F.2d 1248, 1253 (5th Cir. 1986). See generally 3 Wayne R. LaFave et al., Criminal Procedure § 11.10(d), at 1188 (4th ed. 2015).

(emphasis added).  In this way, the prejudice analysis focuses on the time of the guilty plea and takes into account an objective forecast of the risk-reward ratio:

> For example, where the alleged error of counsel is a failure to investigate or discover potentially exculpatory evidence, the determination whether the error "prejudiced" the defendant by causing him to plead guilty rather than go to trial will depend on the likelihood that discovery of the evidence would have led counsel to change his recommendation as to the plea.  This assessment, in turn, will depend in large part on a prediction whether the evidence likely would have changed the outcome of a trial.  Similarly, where the alleged error of counsel is a failure to advise the defendant of a potential affirmative defense to the crime charged, the resolution of the "prejudice" inquiry will depend largely on whether the affirmative defense likely would have succeeded at trial.

Id.  "In the end 'such an assessment of the outcome at a possible trial must be made objectively,' based solely on the historic facts as they existed at the time of trial rather than from the distorting lens of hindsight."  Smith, 291 Va. at 267, 781 S.E.2d at 749 (quoting Lewis v. Warden, 274 Va. 93, 118, 645 S.E.2d 492, 507 (2007)); see also Strickland v. Washington, 466 U.S. 668, 690 (1984).

There are important "variations" of the prejudice requirement.  Smith, 291 Va. at 267 n.6, 781 S.E.2d at 749 n.6.  But none of them departs from first principles.  In Padilla v. Kentucky, 559 U.S. 356 (2010), the defendant claimed that he had entered into a guilty plea based on inaccurate advice about the effect of a criminal conviction on his immigration status.  While recognizing such advice as a potential breach of the Sixth Amendment right to effective assistance of counsel, the United States Supreme Court in Padilla was careful not to craft a wholly new prejudice formula for this type of claim.  "Whether [Padilla] is entitled to relief depends on whether he has been prejudiced, a matter that we do not address."  Padilla, 559 U.S. at 360; see also id. at 374 (emphasizing that the presence or absence of "prejudice" was "a question we do not reach").

17

All Padilla said on the subject was that the decision to reject the plea bargain and go to trial must at least be "rational." Id. at 372. By using this expression, however, "Padilla did not delineate a new standard for prejudice under Strickland." People v. Hernandez, 1 N.E.3d 785, 788 (N.Y. 2013). It instead provided "a simple rephrasing of the existing rule described in Strickland, Hill and their progeny." Id.

In this context, a decision to reject a plea agreement may be deemed objectively rational only if a viable legal basis exists for believing the result at trial *could* be (as opposed to *would* be)[3] better than the plea agreement. The prejudice inquiry, therefore, "does not allow the defendant to 'receive a windfall as a result of the application of an incorrect legal principle or a defense strategy outside the law.'" Ortiz-Graulau v. United States, 756 F.3d 12, 20 (1st Cir. 2014) (quoting Lafler v. Cooper, ___ U.S. ___, ___, 132 S. Ct. 1376, 1387 (2012)), cert. denied, ___ U.S. ___, 135 S. Ct. 1438 (2015). It is in this way that the prejudice inquiry "closely resemble[s] the inquiry engaged in by courts reviewing ineffective-assistance challenges to convictions obtained through a trial." Hill, 474 U.S. at 59. Consequently, "it is often quite difficult for petitioners who have acknowledged their guilt to satisfy Strickland's prejudice prong." Padilla, 559 U.S. at 371 n.12.

The same is true in the Padilla context because, here too, the "potential strength of the state's case must inform [the prejudice] analysis, inasmuch as a reasonable defendant would surely take it into account." United States v. Akinsade, 686 F.3d 248, 255 (4th Cir. 2012)

---

[3] I agree with Galdamez that it would be wrong to think "that in any case in which the prosecution can allege facts that could lead to a conviction, then a defendant could *never* satisfy the prejudice prong of the Strickland test, as they would have been convicted even with effective assistance of counsel." (Emphasis added.) My point is merely that the inverse of this fallacy — that prejudice can *always* be shown when a defendant hypothesizes an acquittal at trial — is equally wrong.

18

(citation omitted).[4] If a defendant proffers no legally plausible defense to incriminating evidence that is "invincible on its face," id. (citation omitted), he cannot objectively demonstrate prejudice in cases in which the immigration consequences would be the same whether he pleaded guilty before trial or was simply found guilty at trial.[5] In other words, if a defendant has no viable defense as a matter of law — thus rendering the charge essentially incontestable at trial — it would not be objectively rational to reject a plea bargain affording him a lesser degree of guilt (such as reducing a felony hit-and-run charge to a misdemeanor) accompanied by a lesser degree

---

[4] A footnote in Akinsade correctly observed that "Padilla only reached prong one of Strickland," which addresses ineffective assistance of counsel, and the only issue in Akinsade was — as it is in Galdamez's case — the second prong of Strickland, which addresses prejudice. Akinsade, 686 F.3d at 251 n.3. If Padilla had addressed the prejudice standard, the Fourth Circuit would have been obligated to decide whether the Padilla prejudice rule should be retroactively applied. The Fourth Circuit, however, "decline[d] to address the issue of whether Padilla is retroactively applicable" precisely because Padilla did not address, much less alter, the prejudice prong of Strickland. Id.

The same observation is true of Pilla v. United States, 668 F.3d 368, 373 (6th Cir. 2012). In that case, the Sixth Circuit stated that it "need not decide" the retroactivity of Padilla because Padilla addressed only the first prong of Strickland, by holding that the failure to give advice about immigration consequences can be ineffective assistance, and that prong of Strickland did not matter "because in any event Pilla cannot show prejudice." Pilla, 668 F.3d at 373 (applying the Hill prejudice standard).

The United States Supreme Court later held in Chaidez v. United States, ___ U.S. ___, ___, 133 S. Ct. 1103, 1108 (2013), that Padilla announced a "new rule" applying the first prong of Strickland (ineffective assistance of counsel) to advice concerning the immigration consequences of a guilty plea. Nothing in the majority, concurring, or dissenting opinions in Chaidez suggested that Padilla altered in any way the existing precedent on prejudice, the second prong of Strickland.

[5] Akinsade presents a good example of how prejudice can be established. There, a defendant "pleaded guilty to a deportable offense that 'involve[d] fraud or deceit in which the loss to the victim or victims exceed[ed] $10,000.'" Akinsade, 686 F.3d at 256 (alterations in original) (citation omitted). The defendant established prejudice by proffering a legally plausible basis for showing that the actual "amount of loss was $8,000," id., which, if true, would be a legally dispositive defense to the deportable conviction. "*Consequently*," the Fourth Circuit held, "the choice to go to trial [was] rational" from the objective perspective of a reasonable defendant. Id. (emphasis added).

19

of punishment (such as serving ten days in jail instead of facing the possibility, however improbable, of a ten-year prison term).

It is entirely true that a defendant may subjectively believe that he has nothing to lose and may as well take his chances, thinking he could do no worse by electing to go to trial. But that personal belief, irrespective of motives for thinking so, does not constitute objective prejudice under settled principles of habeas law.[6] Indeed, the United States Supreme Court "has never established anything akin" to a "'nothing to lose' standard for evaluating Strickland claims." Knowles v. Mirzayance, 556 U.S. 111, 122 (2009). Adopting such a prejudice standard would be conceptually indistinguishable from simply abolishing it altogether.

B.

In this case, the habeas court held that Galdamez did not have a legally viable defense to the DWI charge. Galdamez does not contest that finding on appeal. The habeas court, however, held that under Code § 46.2-894, Galdamez had "a very valid defense to the felony hit and run" because, after fleeing from the scene of the accident, he "returned" approximately fifteen minutes later, J.A. at 164-65, in enough time to make his "presence known" to the police arriving thereafter on the scene, id. at 171. On that basis alone, the court concluded that Galdamez had a legally rational reason to reject the guilty plea, assert his "very valid" defense at the felony trial, and seek an acquittal that would save him from the threat of deportation. Id.

---

[6] See United States v. Kayode, 777 F.3d 719, 727 (5th Cir. 2014) (finding it irrational for a defendant facing deportation whether he pleaded guilty or was convicted at trial to reject a plea agreement when "acquittal was possible in theory" but "improbable in this case, given the Government's overwhelming evidence"); Pilla, 668 F.3d at 373 (finding no prejudice when defendant "faced overwhelming evidence of her guilt," "had no realistic chance of being acquitted at trial," and "would have been just as removable as she was after her guilty plea" if she were convicted at trial).

20

My problem with this reasoning is simple: There is no such defense under Virginia law. Code § 46.2-894 is a hit-and-run statute, not a hit-run-and-never-return statute. It states that a driver of a vehicle "shall *immediately* stop as close to the scene of the accident as possible" if the accident involves any damage, personal injury, or death. Code § 46.2-894 (emphasis added). There are several purposes for this compulsory duty, not the least of which is to determine whether the other driver or his passengers need immediate medical assistance. If so, the statute requires the driver to "render reasonable assistance to any person injured in such accident, including taking such injured person to a physician, surgeon, or hospital if it is apparent that medical treatment is necessary or is requested by the injured person." Id.

The statute recognizes that there may be times when the driver, "because of injuries sustained in the accident," is effectively "prevented" from immediately stopping at the accident scene and offering assistance. Id. In that scenario, the driver must report the accident "as soon as reasonably possible" to law enforcement and "make a reasonable effort to locate" the persons and vehicles involved in the accident. Id.

Nothing in the statute, however, authorizes the driver to flee the accident scene so that he can talk the matter over at a friend's house — so long as he gets back to the accident scene in enough time to get arrested. By his own admission, this is exactly what Galdamez believed to be his defense to the felony hit-and-run charge. Ironically, he held to this view even while asserting that, at some point after the accident but before being arrested, he engaged in "post-driving alcohol consumption." J.A. at 21 (affidavit), 126 (reaffirming his affidavit). Under his interpretation of Code § 46.2-894, Galdamez apparently believed that he had a legal right to go to a friend's home for a drink before deciding whether to return to the accident scene.

21

I find Galdamez's proffered defense to be intrinsically flawed. The statutory command to "immediately stop" means to stop *immediately*. Id. The only statutory excuse for not stopping immediately is when "injuries sustained in the accident" render stopping to be medically ill-advised or physically impossible. Id. Nothing in Code § 46.2-894, or in any authoritative judicial interpretation of it, supports the legal viability of this proffered defense. The habeas court, therefore, erred in accepting it.

C.

Recognizing the weakness of his view of the hit-and-run statute, Galdamez falls back on the argument that it does not really matter whether his defense was legally viable because the jury might have accepted it anyway. And if the jury did, Galdamez points out, double-jeopardy principles would render the acquittal verdict invulnerable to attack. I do not deny this hypothetical possibility but, nevertheless, cannot endorse it. Jury nullification is a reality, but it is not a variable that any court should factor into the prejudice standard for habeas cases.

The prejudice analysis "must exclude the possibility of arbitrariness, whimsy, caprice, 'nullification,' and the like." Strickland, 466 U.S. at 695. "Even if there is a possibility that a jury would have reached a different outcome . . . , the prejudice inquiry does not allow the defendant to 'receive a windfall as a result of the application of an incorrect legal principle or a defense strategy outside the law.'" Ortiz-Graulau, 756 F.3d at 20 (quoting Lafler, ___ U.S. at ___, 132 S. Ct. at 1387). Consequently, anything remotely similar to jury nullification should be considered legally "irrelevant to the prejudice inquiry." Jones v. Jones, 163 F.3d 285, 306 (5th Cir. 1998) (quoting Strickland, 466 U.S. at 695).

To be legally valid, a prejudice hypothesis must assume that the factfinder will "reasonably, conscientiously, and impartially" follow the applicable legal standards and be free of

22

any "unusual propensities" inconsistent with that assumption. <u>Strickland</u>, 466 U.S. at 695. The prejudice requirement cannot be satisfied by relying on the "luck of a lawless decisionmaker," <u>Nix v. Whiteside</u>, 475 U.S. 157, 175 (1986) (quoting <u>Strickland</u>, 466 U.S. at 695), because the analysis "should be made objectively, without regard for the 'idiosyncrasies of the particular decisionmaker.'" <u>Hill</u>, 474 U.S. at 59-60 (quoting <u>Strickland</u>, 466 U.S. at 695).

D.

Further pivoting from the habeas court's "very valid defense" theory, J.A. 164-65, Galdamez attempts on appeal to recast the court's ruling as one contemplating the possibility that he was unaware that he had ever been in an accident. The majority finds this thesis persuasive. I do not. Galdamez raised this point for the first time at the habeas evidentiary hearing. <u>Id.</u> at 128. His habeas petition did not assert this theory, nor did his affidavit in support of the petition. <u>See id.</u> at 1-12, 21-23. His counsel conspicuously chose not to mention it during oral argument before the habeas court. <u>See id.</u> at 158-61. Even so, upon this premise, the majority apparently views the assertion that Galdamez fled the scene of the accident to be inconsequential because it was contradicted by the implicit factual findings of the habeas court following the evidentiary hearing. I find this inference doubtful at best.

As noted earlier, the habeas court granted the evidentiary hearing, as its letter opinion stated, to resolve "the *factual dispute about the specific advice*" that Galdamez alleged he had received from his former counsel. J.A. at 68 (emphasis added). The court limited the evidentiary hearing to the ineffective assistance issue because of the court's erroneous view that prejudice would necessarily follow: "*If* Mr. Galdamez had been properly advised," the court said in its letter opinion, "his decision to reject the plea agreement and go to trial would have been

23

rational." Id. (emphasis added). I thus reject the unstated assumption in the majority opinion that the facts found in habeas court's letter opinion should be disregarded on appeal.

The letter opinion stated that the "record in this case reve[a]ls the following facts." J.A. at 62.[7] One of the facts recited is that "Galdamez initially *fled* the scene of the accident." Id. at 63 (emphasis added). One does not *flee* something he is unaware of. No one would say, for example, the mouse fled the cat but was unaware of the cat. The very act of fleeing implies some fearful knowledge of the thing from which Galdamez fled. It would be illogical to assume, therefore, that the habeas court implicitly found Galdamez was unaware of the accident after expressly finding that he "fled the scene of the accident." Id.

To be sure, the habeas court's reasoning — that Galdamez had a valid defense to the felony hit-and-run charge because he returned to the scene of the accident before the police arrived — necessarily presupposed the court's earlier finding that he initially fled the scene of an accident involving vehicular damage. The entire discussion of any such "defense" would be logically and legally irrelevant if Galdamez did not know at the time he struck the other vehicle that damage of some degree had occurred to one of the two vehicles. If he truly had no basis for knowing that fact, he would have had no duty at all to stop at the accident scene, and, *a fortiori*, he would have had no duty to return to the scene after innocently driving away from it. See Herchenbach v. Commonwealth, 185 Va. 217, 220, 38 S.E.2d 328, 329 (1946) (explaining that the violation occurs when the driver is "aware that harm has been done" and leaves the accident scene "with that in his mind" (citation omitted)).

It is also inconceivable that Galdamez could have driven away from the scene of the accident believing *no* damage of *any* degree had occurred to one or both of these vehicles. That

---

[7] A habeas court's factual findings may be based on the "recorded matters," Code § 8.01-654(B)(4), and "affidavits of witnesses." Code § 8.01-660.

24

he may not have realized the severity of damage is irrelevant.[8]  Virginia law has never required

any "positive knowledge of the extent of the damage or injuries inflicted."  Payne v.

Commonwealth, 277 Va. 531, 544, 674 S.E.2d 835, 842 (2009) (citation omitted); Herchenbach,

185 Va. at 220, 38 S.E.2d at 329 (explaining that the duty to stop arises when the circumstances

"would ordinarily superinduce the belief in a reasonable person that injury [or vehicular damage]

would flow, or had flowed, from the accident or collision").

　　Given the extent of its discussion of Herchenbach, it appears the majority sees that case

as analogous to this one.  See ante at 7.  I do not follow the analogy.  In Herchenbach, the parties

> conceded that it was a very foggy night. . . . so dense that *it was*
> *impossible for the operator to see more than a few feet in advance*
> *of his vehicle*.  At times the headlights were raised in order for the
> driver to see as far ahead as possible. When this was done*, it was*
> *impossible to discern objects on the roadbed immediately in front*
> *of the bus.*

185 Va. at 221, 38 S.E.2d at 329 (emphasis added).  Given these undisputed facts, we concluded:

> A heavy bus loaded with 35 passengers and their baggage could
> have passed over the head or body of a person without the driver or
> passengers being able to distinguish the jar or jolt, if any, from that
> made by the wheels of the bus passing over any ordinary defect in
> the roadbed.

Id. at 221, 38 S.E.2d at 330.

　　These unique facts are not analogous to the circumstances of Galdamez's collision.  In

the case before us, the accident did not take place on a "very foggy night" making it

"impossible" to see more than a "few feet in advance of his vehicle" or sometimes to even see

the "roadbed immediately in front" of the driver.  Id. at 221, 38 S.E.2d at 329.  Galdamez never

claimed that he could not see the victim's vehicle or that anything obstructed his vision of the

---

[8] I thus attach no significance to the possibility, "given the expense of car repairs generally, that the damage was not particularly extensive, despite the estimated costs of car repairs."  Ante at 8.

lighted roadway. Nor did Galdamez, like the bus driver in Herchenbach, run over something lying on the road. Galdamez ran *into* something — a moving vehicle directly in front of him.

The habeas court made a factual finding that Galdamez's vehicle "struck" the victim's vehicle, causing "damage" to it. J.A. at 63. The arresting officer's report confirmed visible damage to the entire right side of the victim's vehicle and to the entire front of Galdamez's vehicle. The report further estimated that $4,000 in damage occurred to the front of Galdamez's vehicle and $2,000 in damage to the entire right side of the victim's vehicle. Id. at 54, 57. The collision had enough force to cause the victim's vehicle to veer into and over a concrete median, leaving it stranded in a lane facing oncoming traffic. Id. at 57. Galdamez returned to the accident scene not because of any post-accident discovery on his part, but because he was "persuaded by a friend to return to the scene." Id. At no point did the habeas court ever retract these findings, and I find it entirely implausible that the habeas court could have done so.

Finally, the habeas court quoted the arresting officer's description of Galdamez as "obviously drunk." Id. at 63. Finding this description persuasive, the court specifically held Galdamez had no defense to the DWI charge. See id. at 167. I agree. As a matter of law, voluntary intoxication "is generally not an excuse for any crime" with the exception of cases involving deliberate and premeditated murder. Riley v. Commonwealth, 277 Va. 467, 479, 675 S.E.2d 168, 175 (2009) (citation omitted).[9] It is altogether improbable, therefore, that the habeas

---

[9] See also Swisher v. Commonwealth, 256 Va. 471, 488, 506 S.E.2d 763, 772 (1998); Wright v. Commonwealth, 234 Va. 627, 629, 363 S.E.2d 711, 712 (1988); Johnson v. Commonwealth, 135 Va. 524, 529, 115 S.E. 673, 675 (1923); Boswell v. Commonwealth, 61 Va. (20 Gratt.) 860, 869-70 (1871); see also 4 William Blackstone, Commentaries *26 ("But the law of England, considering how easy it is to counterfeit this excuse [of voluntary intoxication], and how weak an excuse it is, (though real,) will not suffer any man thus to privilege one crime by another."). See generally John L. Costello, Virginia Criminal Law and Procedure § 34.4[3], at 524 (4th ed. 2008).

court could have implicitly concluded that Galdamez's intoxicated state made him unaware that he was involved in an accident involving some degree of vehicular damage.

E.

Galdamez makes his last stand based upon our recent decision in <u>Zemene v. Clarke</u>, 289 Va. 303, 768 S.E.2d 684 (2015). In that case, Galdamez contends that we jettisoned the traditional prejudice standard for a far more permissive standard recognizing that the subjective desire to avoid a negative immigration consequence was *itself* a sufficiently valid basis upon which to find prejudice even if, objectively speaking, there was no legally viable reason to believe that going to trial might actually avoid that consequence. I disagree.

In <u>Zemene</u>, a defendant was charged with attempting to shoplift $33 worth of beer. Pursuant to a plea agreement, he pleaded guilty to a petit larceny conviction in exchange for a fully suspended twelve-month sentence. The defendant, a lawful noncitizen, learned after his conviction that a theft conviction carrying a sentence of "at least 1 year" (even one fully suspended) would subject him to immigration removal proceedings. <u>Id.</u> at 307-08, 768 S.E.2d at 686-87. He filed a habeas petition claiming his counsel never gave him any advice about the possible immigration consequence of the plea agreement. <u>Id.</u> at 308-09, 768 S.E.2d at 687. Had he known a sentence of only *one day less* than the sentence in his plea agreement would have eliminated *any* risk of removal, the defendant argued that he would have rejected the plea bargain and gone to trial. <u>Id.</u> at 309, 768 S.E.2d at 687.

The defendant in <u>Zemene</u> did not claim that he had any viable legal defense to the petit larceny. Instead, he argued that he had a factually viable basis to challenge the imposition of the maximum twelve-month sentence — and it was the sentence, not the conviction itself, that mattered for purposes of his immigration status. <u>Id.</u> at 315, 768 S.E.2d at 691. We agreed. In

27

this context, it was irrelevant whether the defendant could show a plausible "likelihood of acquittal at trial." Id. at 316, 768 S.E.2d at 691. His adverse immigration consequence could be wholly avoided with far less of a showing. All Zemene needed to show was what he clearly did show: He could have avoided any risk of removal altogether "if he obtained a sentence of even a single day less than the maximum." Id. at 317, 768 S.E.2d at 692.

The situation in Zemene is not at all like the one that Galdamez faced. In Zemene, the defendant had a factually viable basis to challenge the imposition of the maximum punishment, and that *alone* would have eliminated the risk to his immigration status. In Galdamez's case, he had no legally viable defense to an incontestable charge of hit-and-run, and *only a complete acquittal* — nothing less — would have eliminated the negative consequence for his immigration status. In both cases, Zemene and the present case, the prejudice standard is objectively consistent. Its application differed because the circumstances differed — a factually viable challenge to the imposition of maximum punishment was dispositive in one case, and a legally meritless defense to criminal liability is dispositive in the other. I thus reject Galdamez's argument that our reasoning in any way repudiates Zemene.

III.

In sum, I agree with the habeas court that the prejudice standard did not require Galdamez to show a likelihood of an acquittal or anything close to that. Even so, at a minimum, Galdamez had to proffer a factually and legally valid basis for believing — from the objective perspective of a reasonable defendant — that his theory of defense could have led to an acquittal. The habeas court held that he did. I disagree. Galdamez's hope of an acquittal on the hit-and-run charge rested entirely on a defense that does not exist under Virginia law.

28

Without that defense, his remaining optimism could only arise from the possibility of jury nullification, the idiosyncrasies of a trial judge, or some other similar jurisprudential aberration. Settled principles of habeas law preclude that approach. Accepting an anything-could-happen hypothesis would eliminate — not satisfy — the prejudice requirement. I appreciate that the majority does not adopt this erroneous view of habeas law. The majority's attempt to sideline it on factual grounds, however, is entirely unpersuasive. I thus respectfully dissent.