PRESENT: Lemons, C.J., Goodwyn, Mims, Powell, Kelsey, and McCullough, JJ., and Koontz, S.J.

SARAH ELIZABETH FLANDERS

v. Record No. 181228

COMMONWEALTH OF VIRGINIA

OPINION BY
JUSTICE WILLIAM C. MIMS
February 13, 2020

FROM THE COURT OF APPEALS OF VIRGINIA

In this appeal, we consider as a matter of first impression whether felony hit and run may serve as a predicate offense for a felony-homicide conviction.

## I. BACKGROUND AND MATERIAL PROCEEDINGS BELOW

"On appeal, we review the evidence in the 'light most favorable' to the Commonwealth, the prevailing party in the trial court." *Vasquez v. Commonwealth*, 291 Va. 232, 236 (2016) (quoting *Bowman v. Commonwealth*, 290 Va. 492, 494 (2015)). So viewed, the evidence established that while a utility crew conducted overnight repair work, a man walked through the job site causing them to suspend work until he cleared the area. Five or ten minutes later, a woman later identified as Sarah Flanders "abruptly" pulled up to the job site in a red Dodge Durango and asked the workers to call 911 because it "looked like someone had been run over behind" the neighboring school and "the person was bleeding to death." She then "sped away" and "quickly left the scene."

The utility crew's supervisor drove behind the school to investigate. He found an injured man, who he recognized as the same person who had passed through earlier. He was conscious but visibly in "a lot of pain." He had difficulty breathing and was bleeding from abrasions on his head and knees. He told the supervisor that he had been hit. The supervisor immediately called 911. By the time first responders arrived five minutes later, the man had lost consciousness. A

police officer observed that the man's clothes and backpack had black marks "like soot" on them and that there were visible tire tracks in the pine needles and soil of the median where he was lying. The man eventually regained consciousness and identified himself as Rick Pentz. Pentz was transported to a hospital where he died approximately four hours later from blunt force trauma to his torso.

Police collected various personal items belonging to Pentz from the scene, including a cell phone whose call log reflected a 19-second call to Flanders approximately an hour before the incident. During an interview with investigators the next day, Flanders denied any involvement in Pentz' death. She did, however, admit that she drove a red Dodge Durango on the date of the incident. She also said that she knew Pentz and had been friends with him for around six years. The two of them had once lived together in a residence close to where the incident occurred. When asked whether she had been with Pentz lately, she replied that she had last seen him earlier in the week when she dropped him off at work. Investigators eventually told Flanders that Pentz had died, then left her alone in the interview room where she was overheard saying aloud to herself that "she thought that this was crazy and that she thought that he was going to make it."[1]

Investigators seized and forensically examined the Durango they suspected Flanders drove during the incident. They identified Pentz' blood on the front bumper. In addition, the investigators found yellow paint consistent with the yellow paint on the median curb where Pentz was found inside of the front and rear driver's side tires. Mail addressed to Flanders was in the passenger seat, and her DNA was on the steering wheel and gear shift knob.

---

[1] The detective who interviewed Flanders testified that she made several statements while she was alone in the interview room. Specifically, he testified that "[m]uch of [what she said] was unintelligible, but she did say a few moments later that she thought that this was crazy and that she thought that he was going to make it."

Flanders was ultimately charged with felony hit and run, in violation of Code § 46.2-894, and felony homicide, in violation of Code § 18.2-33. At trial, the Commonwealth introduced evidence that Flanders and Pentz were involved in another incident two days prior to Pentz' death. An officer responded to a restaurant parking lot where he encountered a red Dodge Durango parked partially in the road and partially in the grass with a bicycle lying next to it. Flanders was in the driver's seat and Pentz, who had apparently been riding the bicycle, was standing near the driver's door. Both were agitated. The officer asked them whether "somebody had tried to strike somebody with a vehicle," but both denied it. Flanders acknowledged this incident when questioned after Pentz' death and explained that Pentz "had jumped on the passenger door of her Durango."

Counsel for Flanders moved to strike the felony-homicide charge at the close of the Commonwealth's evidence. The crux of his argument was that a hit and run in violation of Code § 46.2-894 was insufficient as a matter of law to support a conviction of felony homicide, and that even assuming that some hit and run convictions could serve as a predicate for felony homicide, the facts of this case did not rise to the level of imputing malice to Flanders' actions. The Commonwealth responded that Flanders' actions amounted to a single, continuous transaction in which she intended to strike Pentz with her vehicle. Under these circumstances, the Commonwealth argued, a felony-homicide conviction was proper because the homicide was within the res gestae of the predicate hit and run. The trial court denied the motion to strike and ultimately found Flanders guilty of both charges, noting that the issues counsel raised "create[] a very interesting legal conundrum that minds wiser than mine will have to sort out for you and your client."

3

Flanders filed motions to set aside the verdict renewing the arguments made at trial and additionally asserting that the evidence at trial was insufficient to support her convictions. Following argument at sentencing, the trial court denied the motions and imposed an active sentence of 22 years' imprisonment. The Court of Appeals affirmed by unpublished opinion, holding that the evidence established that Pentz' death was within the res gestae of the hit and run.

We awarded Flanders this appeal.

## II. ANALYSIS

Flanders' sole assignment of error argues that the evidence was insufficient to support her felony-homicide conviction. Resolving this assignment of error requires a two-step inquiry. The first issue, whether felony hit and run may serve as a predicate offense for a felony-homicide conviction, presents a question of law we review de novo. *See AGCS Marine Ins. Co. v. Arlington Cty.*, 293 Va. 469, 473 (2017) ("[W]e review all conclusions of law de novo."); *see also, e.g.*, *Mulford v. Walnut Hill Farm Grp., LLC*, 282 Va. 98, 106 (2011) ("[T]he ultimate conclusion as to whether [a] roadway [is] a public road is reviewed de novo."). If felony hit and run can be a predicate offense, then the second step is to determine whether the evidence in this case was sufficient to establish that Pentz' death was within the res gestae of the hit and run, and thus was an appropriate predicate offense for Flanders' felony-murder conviction. We apply a familiar standard of review to that inquiry:

> "When reviewing the sufficiency of the evidence, 'the judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it.'" This Court "does not ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt." "Rather, the relevant question is, upon review of the evidence in the light most favorable to the prosecution, whether *any* rational trier of fact could have

4

found the essential elements of the crime beyond a reasonable
doubt."

*Yoder v. Commonwealth*, 298 Va. __, __ (2019) (quoting *Smith v. Commonwealth*, 296 Va. 450, 460 (2018)). To the extent this case involves issues of statutory interpretation, we review them de novo. *Conyers v. Martial Arts World of Richmond, Inc.*, 273 Va. 96, 104 (2007).

A. Development of the Felony-Homicide Doctrine in Virginia

We begin our consideration of felony homicide under Code § 18.2-33 with an overview of how that offense fits within Virginia's scheme for punishing homicides. As early as 1796, the General Assembly perceived a need "to mitigate the harshness of the common law which punished murder and numerous other crimes with death." *Fitzgerald v. Commonwealth*, 223 Va. 615, 636 (1982). Explaining that "the several offences which are included under the general denomination of murder, differ so greatly from each other in the degree of their atrociousness, that it is unjust to involve them in the same punishment," the General Assembly created gradations of murder such that only first-degree murder was punishable by death. Acts 1796, ch. 2; *Fitzgerald*, 223 Va. at 636. Although the General Assembly has amended the murder statutes over time, the sole purpose of these changes has been to create gradations in the punishments imposed. *Fitzgerald*, 223 Va. at 636. These statutory gradations have not created new offenses. Instead, they established punishments for the common law crime of murder that correspond to the degree of culpability with which it is committed. *Id.*; *see Livingston v. Commonwealth*, 55 Va. (14 Gratt.) 592, 596 (1857) ("[T]he true object and effect of [statutory gradations] was not to create two offences out of the crime of murder, but to arrange the various kinds of murder at the common law, under the two denominations of murder in the first degree, and murder in the second degree; and to annex to the cases in each denomination a punishment corresponding in severity to the degree of atrocity with which they might be perpetrated.").

5

Thus, although Virginia law recognizes capital murder, first-degree murder, and second-degree murder and punishes each with different ranges of penalties corresponding to "prevailing societal and legal views of what is appropriate and procedurally fair," *Fitzgerald*, 223 Va. at 636, all three gradations punish the same offense of common-law murder. Code §§ 18.2-10, 18.2-31, 18.2-32; *see Wooden v. Commonwealth*, 222 Va. 758, 761 n.3 (1981); *Livingston*, 55 Va. (14 Gratt.) at 596.

Among the forms of common-law murder punishable as first-degree murder under Code § 18.2-32 is felony murder. Felony murder at common law occurred when an actor unintentionally killed another person during the commission of a dangerous or violent felony. John L. Costello, Virginia Criminal Law and Procedure § 3.4[3], at 59 (4th ed. 2008). The relevant statutory language provides that "[m]urder . . . in the commission of, or attempt to commit, arson, rape, forcible sodomy, inanimate or animate object sexual penetration, robbery, burglary or abduction . . . is murder of the first degree." Code § 18.2-32. Thus, as codified, the offense of felony murder consists of common-law murder "coupled with the contemporaneous commission or attempted commission of one of the listed felonies." *Wooden*, 222 Va. at 761. Each of these enumerated felonies is an inherently dangerous crime. Although there is no malice inherent in an unintentional killing, as this Court explained in *Wooden*, the malice intrinsic in the commission of one of the listed felonies "provides the malice prerequisite to a finding that the homicide was murder" and justifies elevation of even an unintentional killing to first-degree murder. *Id.* at 762.

In 1975, the General Assembly created the offense of felony homicide. The statute codifying this offense, Code § 18.2-33, provides that "[t]he killing of one accidentally, contrary to the intention of the parties, while in the prosecution of some felonious act other than those

specified in §§ 18.2-31 and 18.2-32, is murder of the second degree." This statute uses language modeled on standard definitions of involuntary manslaughter[2] to create a gradation of common-law felony murder that is less culpable than that chargeable as first-degree murder under Code § 18.2-32. Unlike the statutory murder grades, which did not depart from the common law of murder but instead set varying punishments based on culpability, the plain language of the felony-homicide statute goes beyond the common-law understanding of felony murder by permitting murder convictions based on nonviolent predicate felonies. As one commentator has observed:

> It is arguable that the statutory creation of the offense of felony homicide in 1975 departed from the tradition that the Virginia murder statutes only graded the common law of murder for punishment purposes and did not create any new types of murder. . . . [F]elony murder at common law could be predicated only upon a dangerous felony. Felonies which endangered people manifested legal malice and an unintentional killing by the felon in the perpetration of one of them was murder. The Virginia statute is clearly broader than that in its terms.

Costello, *supra*, at § 3.5[1], 66. In light of this apparent disconnect between the General Assembly's centuries-long practice of not expanding upon the common law of murder by statute on the one hand, and Code § 18.2-33's broader reach on the other, determining what felonies may serve as predicate offenses for a felony-homicide conviction requires construing the statutory phrase "some felonious act."

As an initial matter, the legislative history is unhelpful. The General Assembly enacted Code § 18.2-33 during the recodification of Title 18.1. The statute did not exist in prior versions

---

[2] The statutory language substitutes "felonious" for "unlawful, but not felonious," in a commonly used involuntary manslaughter definition. *See, e.g.*, *Mundy v. Commonwealth*, 144 Va. 609, 615 (1926) ("Involuntary manslaughter is the killing of one accidentally, contrary to the intention of the parties, in the prosecution of some unlawful, but not felonious, act; or in the improper performance of a lawful act.").

of the Code, and a note in the Code Commission's report explains only that the statute was "designed to correct an omission in Virginia criminal law." Report of the Virginia Code Commission, Revision of Title 18.1 of the Code of Virginia 27–28 (1973). The report, however, did not explain what the omission was or how the creation of felony homicide was calculated to fill the gap.

Nevertheless, it can reasonably be inferred from Code § 18.2-33's sentencing provisions that the legislature did not intend the statute to depart from the substantive common law of murder. The legislative evidence suggests that the General Assembly did not intend for every felony other than those enumerated in Code §§ 18.2-31 and 18.2-32 to be potential predicate offenses for felony homicide. The statute classifies a felony homicide as a second-degree murder punishable by imprisonment for between five and forty years, the same penalty imposed for any other second-degree murder. Given that the General Assembly's "evident purpose" of grading murders by the culpability with which they are committed is to "assign punishment consistent with prevailing societal and legal views of what is appropriate and procedurally fair," *Fitzgerald*, 223 Va. at 636, it would be a notable aberration for the legislature to enact a statute imposing the same penalty for an accidental homicide occurring during an inherently dangerous or dangerously committed felony as one during a non-dangerous felony. Moreover, treating inherently dangerous felonies and felonies committed in a dangerous fashion identically to non-dangerous felonies in Code § 18.2-33 would be inconsistent with the General Assembly's imposition of punishments proportionate to culpability elsewhere in Title 18.2. *See, e.g.*, Code § 18.2-51 (punishing malicious wounding as a Class 3 felony and unlawful wounding as a Class 6 felony).

Our treatment of prior felony-homicide cases suggests that there are limits to the circumstances under which felonies may serve as predicates for Code § 18.2-33 convictions. Specifically, this Court's inquiries into whether defendants committed the predicate felony with malice and whether the accidental killing occurred within the res gestae of the predicate felony limit the circumstances under which a felony can serve as a predicate offense for felony homicide.

1. Malice and Dangerousness of Underlying Felony

As noted above, the mechanism by which the felony-murder doctrine in Code § 18.2-32 elevates an incidental homicide committed during a felony to first-degree murder is to impute the malice inherent in the underlying felony to the killing. This imputation is necessary because malice is an essential element of murder in Virginia. *Wooden*, 222 Va. at 762. Virginia's felony-homicide doctrine in Code § 18.2-33 operates by the same process of imputation. *See Commonwealth v. Montague*, 260 Va. 697, 700 (2000) (noting that the felony-homicide doctrine "operates to elevate to second-degree murder a homicide committed during the commission of a felony by imputing malice to the killing"). Whereas Code § 18.2-32 expressly contemplates a "killing with malice," "[t]he same imputation of malice is implicit in § 18.2-33 which contemplates an accidental killing." *Heacock v. Commonwealth*, 228 Va. 397, 403 (1984). Thus, for a killing during the prosecution of a felonious act to constitute felony murder, there must be some malice inherent in the underlying felony.

As we have often observed, "the authorities are replete with definitions of malice." *Essex v. Commonwealth*, 228 Va. 273, 280 (1984). "At common law, malice was defined 'as any evil design in general: the dictate of a wicked, depraved, and malignant heart: *un disposition a faire un male chose* [a disposition or inclination to do a bad thing]." *Watson-Scott v. Commonwealth*,

9

298 Va. __, __ (2019) (quoting 4 William Blackstone, Commentaries *198). This Court has long employed a volitional definition of malice requiring that the "wrongful act be done 'willfully or purposefully.'" *Essex*, 228 Va. at 280 (quoting *Williamson v. Commonwealth*, 180 Va. 277, 280 (1942)); *see also Dawkins v. Commonwealth*, 186 Va. 55, 61 (1947) (defining malice as "the doing of a wrongful act intentionally, or without just cause or excuse, or as a result of ill will").

Malice may be either express or implied, but the requisite malice for a felony-homicide conviction will almost invariably be implied from the defendant's conduct because the felony-homicide doctrine contemplates an unintentional killing incidental to the underlying felony. Implied malice "exists where a defendant lacks the deliberate intent to kill, but the circumstances of the defendant's actions are 'so harmful that the law punishes the act as though malice did in fact exist.'" *Watson-Scott*, 298 Va. at __ (quoting *Pugh v. Commonwealth*, 223 Va. 663, 668 (1982)). In determining whether malice may be implied from conduct, we look for actions reflecting "a species of reckless behavior so willful and wanton, so heedless of foreseeable consequences, and so indifferent to the value of human life that it supplies the element of malice." *Id.* (quoting *Essex*, 228 Va. at 288 (Poff, J., concurring)). In addition, malice may be implied from use of a deadly weapon, *id.*, and we have recognized that "[a] motor vehicle, wrongfully used, can be a weapon as deadly as a gun or a knife," *Essex*, 228 Va. at 281.

A nuanced approach to this malice inquiry is apparent in *Heacock*, which gives effect to the General Assembly's broad formulation of the felony-homicide doctrine while recognizing the common-law limitations on the circumstances under which offenses may be predicates for a felony-homicide conviction. In that case, the felony underlying Heacock's felony-homicide conviction was his distribution of cocaine to the victim who died after being injected with the

10

drug. 228 Va. at 403. Heacock protested that because he did not administer the injection and cocaine distribution is not itself a foreseeably dangerous felony, no logical basis existed for imputing malice to the victim's death. *Id.* at 404. We disagreed. After reviewing Code § 18.2-33 and concluding that its implicit imputation of malice from the underlying felony "codifie[d] ancient common law" principles, *id.* at 403 (citing *Whiteford v. Commonwealth*, 27 Va. (6 Rand.) 721 (1828)), the Court held that the evidence supported imputing malice because "Heacock knew, or should have known, that injection of the narcotic he supplied and helped to administer . . . was inherently dangerous to human life," *id.* at 404.

The citation to *Whiteford* is significant because it supports the proposition that Code § 18.2-33 is an application of common-law murder principles requiring the malice inquiry, not new substantive law under which any felony may be a predicate without regard to its inherent dangerousness or the dangerous way in which it is carried out. In a discussion of general common-law murder principles, the Court in *Whiteford* considered several archetypical examples of unintentional homicides that nevertheless evinced malice sufficient to constitute common-law murder. These included the person who shot a fowl with the felonious intent to steal it and unintentionally killed a person with the shot, as well as the workman who, carelessly and without warning, threw a stone or timber from a house in a populous city with the knowledge that people were passing and thus killed a passerby. *Whiteford*, 27 Va. (6 Rand.) at 724–25. These illustrations reflect that an underlying felony must involve some intentional course of wrongful conduct dangerous to human life sufficient to imply malice for that felony to be among the "felonious act[s]" contemplated by Code § 18.2-33. *See Watson-Scott*, 298 Va. at __; *Essex*, 228 Va. at 280–81; *see also* Costello, *supra* at § 3.5[1], 68 ("A review of many Virginia cases

11

dealing with malice did not disclose any case wherein malice was found in the doing of a non-dangerous but wrongful act.").

2. Res Gestae

The doctrine of res gestae provides an additional limitation on what offenses may serve as predicates for felony-homicide convictions. In essence, the res gestae rule requires that there be a connection between the predicate felony and the death, giving effect to the statutory requirement that the death occur "while in the prosecution of" the underlying felony. *See Montague*, 260 Va. at 701; *Heacock*, 228 Va. at 405 ("[W]hen the homicide is within the res gestae of the initial felony and is an emanation thereof, it is committed in the perpetration of that felony." (quoting *Haskell v. Commonwealth*, 218 Va. 1033, 1041 (1978))). Thus, the felony-homicide statute "applies where the killing is so closely related to the felony in time, place, and causal connection as to make it a part of the same criminal enterprise." *Haskell*, 218 Va. at 1044; *see Montano v. Commonwealth*, 61 Va. App. 610, 616 (2013) ("When the homicide 'resulted from an act which was an integral part of the felony or an act in direct furtherance of or necessitated by the felony,' felony [homicide] is established." (quoting *Griffin v. Commonwealth*, 33 Va. App. 413, 425 (2000))). The required elements of the res gestae rule—time, place, and causal connection—are stated in the conjunctive. As such, all three must be proven for the felony-homicide statute to apply. *Montague*, 260 Va. at 702; *see* 7 Ronald J. Bacigal & Corinna Barrett Lain, Virginia Practice Series: Criminal Offenses and Defenses 351–52 (2019–2020 ed.) ("When the death occurs at the time and place of the felony and the felony itself is inherently dangerous, or the felony, not inherently dangerous, is factually committed in a dangerous way, the death is within the res gestae of the felony.").

12

Whether these elements are proven in a particular case is a case-specific inquiry for the fact finder to decide. *Haskell*, 218 Va. at 1043. For instance, in *Haskell*, several assailants attacked an intoxicated sailor in an effort to rob him. *Id.* at 1036. Finding the sailor had nothing of value, the assailants attempted to flee the scene in their car. *Id.* The injured sailor tried to reenter the car to prevent their escape and was killed in the ensuing struggle. *Id.* at 1037. The defendants appealed their felony-murder convictions arguing that because they had abandoned their attempt to rob the sailor, his subsequent death was not within the res gestae of the felony. *Id.* at 1039. We rejected their argument and held that, although the attempted robbery had ended at the time of the killing, the sailor's death "was closely related in time, place, and causal connection to the attempted robbery" such that there was a "continuity of evil action" sufficient to make the killing "part of the same criminal enterprise." *Id.* at 1043–44.

In contrast, all three elements were absent in *Montague*. In that case, the defendant stole a car one day, then struck and killed a pedestrian while evading police in a different location the next. *Montague*, 260 Va. at 699–700. The Commonwealth argued that despite the time elapsing between the grand larceny and the accidental killing, the defendant's flight from police to avoid detection of the larceny established the requisite causal connection between the larceny and the homicide. *Id.* at 700. We disagreed, finding that the eleven-hour period between the larceny's discovery and the homicide meant that the accidental killing "was not related in time to the larceny." *Id.* at 702. Additionally, the fact that the larceny and homicide occurred in different parts of the same city defeated the place element. *Id.* In light of these conclusions, we held that "the grand larceny and the homicide were not parts of the same criminal enterprise as required by the *res gestae* rule," rendering the felony-homicide statute inapplicable. *Id.*

13

These cases illustrate the fact-intensive nature of the res gestae inquiry. A finder of fact must look to the particular aspects of each felony-homicide case to determine whether the death occurred within the res gestae of the underlying felony without relying on rigid formulas. The analysis in *Haskell* indicates that a killing may be within the res gestae even if it does not occur while the predicate felony is ongoing. This result is consistent with the General Assembly's use of the broad phrase, "in the prosecution of some felonious act," which contemplates a killing occurring before, during, or after the underlying felony, provided it shares a causal connection sufficient to make the killing part of the same criminal enterprise. *Haskell*, 218 Va. at 1044; *cf. Harward v. Commonwealth*, 229 Va. 363, 366 (1985) (interpreting the phrase "in the commission of" in Code §§ 18.2-31 and 18.2-32 to "include[] a killing *before*, *during*, and *after* the underlying felony"). This view is consistent with the Court of Appeals' observation in a felony-murder case that "[t]he *res gestae* of the underlying crime begins where an indictable attempt to commit the felony is reached and ends where the chain of events between the attempted crime or completed felony is broken." *Berkeley v. Commonwealth*, 19 Va. App. 279, 286 (1994) (citations omitted). If a fact finder concludes that the accidental killing occurred before that chain of events breaks, then it has occurred within the res gestae of the underlying felony.

Taken together, the principles of imputed malice and res gestae provide guidance regarding when felonies may serve as predicates under Code § 18.2-33. For the felony-homicide statute to apply, the Commonwealth must show that the defendant unintentionally[3] killed a

---

[3] At oral argument, counsel for Flanders contended that this case may involve a judicial estoppel issue because the Commonwealth charged an accidental death but relied on evidence of an alleged intentional act, implying that the Commonwealth did not prove that the killing occurred "accidentally, contrary to the intention of the parties." The model jury instruction for felony homicide includes as an element "[t]hat the killing was accidental and contrary to the

person "while in the prosecution of some felonious act" other than those exempted in the statute. The res gestae rule's requirements that the killing be closely related to the felony in time, place, and causal connection ensures that only those killings occurring "in the prosecution of" a proper predicate felony fall within the statute's ambit. Likewise, only felonies from which malice can be imputed—that is, inherently dangerous felonies or non-dangerous felonies that are actually committed in a dangerous way—can serve as the predicate "felonious act" for a felony-homicide conviction. With these principles in mind, we now consider their application in this case.

B. Hit and Run as a Predicate Offense to Felony Homicide

As an initial matter, Flanders urges this Court to categorically reject the crime of felony hit and run as a predicate offense because recognizing it as such would have substantial negative policy implications. She contends that permitting hit and run to be a predicate would open the door for the Commonwealth to bring felony-homicide charges against every driver involved in a

---

intention of the defendant," although the practice commentary to the instruction observes that several treatises "have opined that the Model Instruction is wrong to require the Commonwealth to prove that the killing was accidental and that the defendant did not intend to kill." Virginia Model Jury Instructions—Criminal, No. 33.340, at 33-89, 33-93 (repl. ed. 2019–20). Indeed, Professors Bacigal and Lain have argued that "to prove a felony homicide it is not necessary that the Commonwealth prove accident/lack of intent. That language has been part of the definition of involuntary manslaughter for at least fifty years, but has never been treated as identifying elements of the offense." Bacigal & Lain, *supra*, at 351. The Court of Appeals has, in dicta, cited this critique with approval. *Cotton v. Commonwealth*, 35 Va. App. 511, 515 n.3 (2001).

The apparent reason killings in felony murders and felony homicides are described as unintentional is that if the killing was intentional, the malice would inhere in the killing itself, and the death would be chargeable as murder. The statutory language referring to an accidental killing thus clarifies how the offense of felony homicide fits within Virginia's scheme for punishing homicides rather than setting out a substantive element that the Commonwealth must prove beyond a reasonable doubt. If the *absence* of intent was a substantive element, an absurd situation would arise when evidence of the defendant's intent is in equipoise. In that situation, as Professors Bacigal & Lain have pointed out, "[a] regular second degree conviction could not be had because intent was not proven beyond a reasonable doubt, but a felony homicide conviction could not be had because the absence of intent was not proven beyond a reasonable doubt." Bacigal & Lain, *supra*, at 351.

hit and run death case. She argues that "would inexorably result in the two charges being paired in every case."

Whether a given offense can serve as a predicate for a felony-homicide conviction under Code § 18.2-33, however, is not a categorical question. Instead, the finder of fact must examine the particular circumstances of each case to determine whether the underlying felony was committed with malice and whether the resulting death fell within the res gestae of the felony. As we have repeatedly emphasized, the touchstone of malice is "volitional action"—the wrongful act must be done intentionally. *Essex*, 228 Va. at 280. "In order to elevate the crime to second-degree murder, the defendant must be shown to have willfully or purposefully, *rather than negligently*, embarked upon a course of wrongful conduct likely to cause death or great bodily harm." *Id.* at 280–81 (emphasis added). This principle addresses the concern that every hit and run death will be charged as murder. Where the accident is unintentional—as is true in the vast majority of felony hit and run cases—it will not support a felony-homicide conviction. A conviction will require the fact finder to find that the defendant intentionally placed the victim in danger such that "the circumstances of the defendant's actions are 'so harmful that the law punishes the act as though malice did in fact exist.'" *Watson-Scott*, 298 Va. at __ (quoting *Pugh*, 223 Va. at 668).

Turning to the specific facts of this case, the evidence viewed in the light most favorable to the Commonwealth demonstrated that Flanders knew Pentz well and had some degree of animosity toward him. Mere days before the hit and run, police were summoned to an incident involving an altercation between the two in which Flanders appeared to have attempted to strike Pentz with her Durango. Telephone records show that Pentz called Flanders roughly an hour before the early morning hit and run. She then navigated to his location in a school's rear

16

parking lot where she struck him with the Durango, a large sport utility vehicle, with enough force to cause fatal injuries. She knew that she struck him because she reported his injuries to the utility crew. Despite her awareness that she had inflicted injuries placing Pentz at risk of "bleeding to death," she nevertheless fled the scene without providing any aid. While alone after the police interview, she said that she "thought that he was going to make it."

Taken together, the evidence is sufficient to establish that malice can be implied from Flanders' actions and that the killing fell within the res gestae of that felony. Although Flanders' statement that she thought Pentz would survive suggests that she did not intend to kill him, her actions nevertheless reveal that she "willfully or purposefully, rather than negligently, embarked upon a course of wrongful conduct likely to cause death or great bodily harm" to Pentz. *Essex*, 228 Va. at 280–81. Unlike typical hit and run incidents, in which the accident is between strangers and occurs on a thoroughfare of some sort, the incident in this case took place in a school's rear parking lot during the early morning hours, a setting in which Flanders had no reason to be. This atypical setting, coupled with the similar altercation involving the Durango just two days earlier, yields an inference that Flanders' conduct was intentionally designed to place Pentz in danger—the essence of malice.

Flanders, however, contends that Pentz' death could not have occurred within the res gestae of the hit and run and that his death was not causally connected to the hit and run. She bases her argument on two cases from the Court of Appeals.

In the first, *King v. Commonwealth*, 6 Va. App. 351, 353–54 (1988), a drug-smuggling airplane crewed by King and a co-felon crashed in adverse weather conditions, killing the co-felon. King was convicted of felony homicide. *Id.* at 354. On appeal, the Court of Appeals held that although the death was close in time and place to the underlying felony, it was not causally

17

connected to drug-smuggling and therefore fell outside the res gestae. *Id.* at 358. It reversed King's conviction because "fog, low cloud cover, pilot error, and inexperience" rather than "an act of the felons in furtherance of the felony" caused the death. *Id.* at 353, 358.

The second, *Griffin*, involved a defendant who accidentally shot his roommate while "dancing to music." 33 Va. App. at 418. He was charged with felony homicide. *Id.* Possession of a firearm by a convicted felon was the predicate felony. *Id.* at 422. The Court of Appeals reversed his conviction, ruling that "no evidence produced at trial established a causal connection between the underlying felony and the accidental killing," which occurred neither in the prosecution of a felonious act nor in furtherance of the felony. *Id.* at 424.

Based on her reading of these cases, Flanders argues that no requisite causal connection exists between the hit and run and the death. The death, she argues, was not a consequence of the felony, nor was it calculated to further the felony. Rather, the death was merely coincident to the hit and run and would have occurred regardless of whether she left the scene. At most, she concedes, the death was close in time and place to the felonious act, just as in *King*.

Flanders' arguments are unpersuasive and the cases upon which she relies are readily distinguished from the case at bar. In this case, Pentz' death was not merely the result of coincident circumstances, but was inextricably connected to the underlying felony because the injury-causing collision is "an integral part of the felony" of hit and run. *Griffin*, 33 Va. App. at 425; *see Clarke v. Galdamez*, 292 Va. 228, 236 (2016). Unlike *King* and *Griffin*, in which the underlying felonies were minimally connected to the death, Pentz' death was the direct result of the felony hit and run. Flanders' actions—striking Pentz, recognizing that his injuries were severe enough to endanger his life, and fleeing the scene without providing aid—caused the injuries and subsequent death four hours later. The "killing was closely related in time, place

18

and causal connection to the [hit and run]. Indeed, the two crimes were inextricably interwoven." *Haskell*, 218 Va. at 1043.

Accordingly, Flanders committed the hit and run with malice sufficient to elevate the killing to second-degree murder and Pentz' death occurred within the res gestae of the underlying hit and run. The Court of Appeals did not err in affirming Flanders' conviction of felony homicide.

### III. CONCLUSION

Because it is possible for felony hit and run to have been committed with malice and for the resulting death to fall within the res gestae of that offense, felony hit and run may serve as a predicate offense for felony homicide upon such facts. In this case, the evidence viewed in the light most favorable to the Commonwealth established that Flanders intentionally acted in a manner endangering Pentz such that malice could be implied from her conduct, and that Pentz' death was sufficiently related to the hit and run in time, place, and causal connection such that it was within the res gestae of the felony hit and run. Accordingly, we will affirm the Court of Appeals' judgment based on the conclusion that the evidence was sufficient to sustain Flanders' conviction for felony homicide.

*Affirmed.*